In re Petition for a WRIT OF PROHIBITION or in the Alternative for a WRIT OF MANDAMUS.

THE HONORABLE JERRY CARR WHITEHEAD, Petitioner, *v.* NEVADA COMMISSION ON JUDICIAL DISCIPLINE, Respondent.

No. 24598

April 22, 1994

873 P.2d 946

*Ohlson & Springgate,* Reno; *Hamilton & Lynch,* Reno; *Gentile, Porter & Kelesis,* Las Vegas; *Laura Wightman FitzSimmons,* Las Vegas, for Petitioner.

*Frankie Sue Del Papa,* Attorney General, *Brooke Nielsen,* Deputy Attorney General, Carson City; *Donald J. Campbell,* Las Vegas, for Respondent.

## OPINION

By the Court, ZENOFF, SR. J.:

I.

*PREFACE*

This is the second formal interlocutory opinion issued by this court in this proceeding. By way of candor, we note that despite this opinion's being formally authored by SENIOR JUSTICE ZENOFF, the opinion represents the combined efforts of SENIOR JUSTICE ZENOFF, JUSTICES STEFFEN and SPRINGER and several members of the court's staff. Our purpose is three-fold: (1) to resolve three of the more than thirty motions and other formal requests for relief that have been filed in this proceeding since its inception; (2) to clarify for the benefit of Judge Jerry Carr Whitehead, the Commission, and the public, the basic issues that have been presented in this matter and the course that this court will pursue in resolving those issues; and (3) to disabuse the Commission of certain misconceptions regarding the proceedings before this court and this court's decision to intervene in the Commission proceedings regarding Judge Whitehead.

## II.
### *PRELIMINARY PROCEDURAL MATTERS*

A. *The Commission's motion to file document in excess of ten pages*

On March 8, 1994, the Nevada Commission on Judicial Discipline moved this court in accordance with this court's rules of appellate procedure[1] for permission to file a document in excess of ten pages which is entitled: "Respondent Judicial Discipline Commission's Petition for Rehearing or in the Alternative Motion for Amendment of Opinion" (hereinafter "Petition/Motion"). The Commission asserted that, although it had "endeavored to restrict the Petition/Motion to the ten page limit," it had been "unable to do so in light of the complex factual and legal matters which [it] believes must be addressed in the Petition/Motion." For reasons more fully discussed below, we conclude that the Commission's Petition/Motion constitutes a procedurally improper, successive application for rehearing or reconsideration which fails to direct this court's attention to any germane, legal or factual matter previously overlooked or misapprehended by this court. Nonetheless, we have concluded that the Petition/Motion should be made a part of the historical record of this proceeding. Accordingly, we direct the Clerk of this Court to file that document.

B. *The Commission's motion to strike Judge Whitehead's answer*

On March 16, 1994, this court entered an order noting that, although it appeared that several aspects of the Commission's Petition/Motion were not in compliance with the rules of this court, it nonetheless appeared appropriate to require counsel for Judge Whitehead to tender an answer to the Petition/Motion. Pursuant to that order, Judge Whitehead lodged an answer to the Petition/Motion with the court on March 24, 1994.

On April 6, 1994, the Commission filed a motion to strike the answer. The Commission argues that the answer does not address the matters raised in the Commission's Petition/Motion and injects irrelevant matters into this proceeding. Judge Whitehead has opposed the motion. Contrary to the Commission's contention, we have concluded that Judge Whitehead's answer presents well-supported, relevant and persuasive legal argument respecting the insufficiency and immateriality of the Commission's Petition/Motion. Moreover, to whatever extent the answer may contain facts and argument that this court considers irrelevant to

---

[1] NRAP 40(b) provides in part: "Except by permission of the court, a petition for rehearing shall not exceed 10 pages . . . ."

the matters properly at issue herein, this court will disregard them. Accordingly, we deny the Commission's motion to strike, and we direct the Clerk of this Court to file the answer tendered by Judge Whitehead on March 24, 1994.

## III.

### THE COMMISSION'S PETITION FOR REHEARING OR IN THE ALTERNATIVE MOTION FOR AMENDMENT OF OPINION

As noted, on March 8, 1994, Attorney General Frankie Sue Del Papa, together with her Chief Deputy Brooke Nielsen and her Special Deputy Attorney General/Special Counsel Donald J. Campbell, lodged with the Clerk of this Court a document entitled: "Respondent Judicial Discipline Commission's Petition for Rehearing or in the Alternative Motion for the Amendment of Opinion."[2] The Petition/Motion asserts that our initial interlocutory opinion in these proceedings was inaccurate in various particulars; however, no suggestion is offered that the dispositive result reached by this court should be altered. *See* Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 128, 869 P.2d 795 (1994), to which we refer herein as *"Whitehead I."*[3] Ordinarily, in matters in which less public controversy has been generated, petitions for rehearing that do not seek to change the result of our rulings, and that are otherwise defective in multiple respects, as in the instant case, typically result in an order of summary denial. Nevertheless, once again, out of respect for the Nevada Commission on Judicial Discipline, we will more fully explicate the basis for denying the improperly presented Petition/Motion now before us.

---

[2]In our initial Opinion, *Whitehead I,* we referred collectively to the three aforementioned persons as "Attorney General Del Papa and associates." Although we intended no offense, it now appears that the subjects found this description objectionable. Consequently, in this Opinion, we will, instead, refer to them collectively as the "Commission's counsel." In so doing, however, we in no way wish to diminish, disregard, or decide the extent to which the Attorney General and others under her direct control and supervision have also functioned in an investigatory and prosecutorial capacity.

[3]In *Whitehead I,* for the edification of the Commission, we laboriously explained the reasoning that supports three quite self-evident conclusions: (1) that this court may entertain petitions for extraordinary writs which question actions or proceedings of the Commission alleged to be without or in excess of jurisdiction; (2) that we may order evidence produced which may have a bearing on such issues; and (3) that the Commission, like all other tribunals, state officials, and entities must obey rules promulgated and orders issued pursuant to this court's constitutionally derived authority.

## A. *The Petition/Motion seeks to assign full responsibility to the Commission for improper conduct to which* Whitehead I *makes reference*

Among the unusual aspects of the Petition/Motion is the fact that the document is signed not only by the Commission's counsel but also by each of the Commission members (Judge Whitehead's judges). In light of this court's statements in *Whitehead I* suggesting that the Commission's counsel may have incorrectly counselled the Commissioners, we can understand why the Commission's counsel and the Commissioners might now wish to attempt to underscore that the matters in the Petition/Motion are not merely the arguments of counsel, but have been tendered with the approval of the Commissioners. Nonetheless, we disapprove of the practice, and we hereby instruct the Commission's counsel and all Nevada attorneys that it should not be utilized again.[4]

The Petition/Motion attributes a wide range of beliefs, thought processes, knowledge and convictions collectively to all of the Commission's members. As an example, by personally signing the Petition/Motion, the Commission members endorse statements taking full responsibility upon themselves for the improper conduct to which *Whitehead I* makes reference. We cannot, however, accept that the Commission's counsel have no responsibility because they were "just following orders." The record establishes that most, if not all, documents contumaciously withheld from this court, to the derogation of Judge Whitehead's rights, were in fact in the custody of the Commission's counsel rather than Commission members. It is also incontestable that inasmuch as the Commission's counsel have provided legal counsel to the Commission, they had an obligation to research the law diligently and to advise the Commission *and this court* accurately. The assertion, therefore, cannot be accepted that the Commission members are solely responsible for violations of the Constitutional principles and court rules engaged in by the Commission's counsel in the Commissioners' names; and, so, no correction of our opinion in *Whitehead I* is warranted.[5]

---

[4]NRAP 46(b) provides that "[w]ith leave of the Supreme Court, a party may file, in proper person, written briefs and papers submitted in accordance with these rules." The Commission has not sought leave of this court to proceed in proper person.

[5]We must mention that our *Whitehead I* Opinion was not intended to insult the intellects of the Commission members, as the Petition/Motion suggests. We were simply endeavoring to withhold the expression of any unnecessary

## B. *The Commission's Petition/Motion is improperly successive in nature*

Following this court's order of October 4, 1993, which required the Commission to produce documents for our *"in camera"* inspection, the Commission filed a motion on October 12, 1993, for reconsideration; but, as *Whitehead I* points out, the Commission's counsel made absolutely no effort to achieve an accelerated consideration of this motion for reconsideration.[6]

It was the Commission's motion for reconsideration of October 12, 1993, that was denied by this court's *Whitehead I* Opinion. The current Petition/Motion seeks a rehearing of *Whitehead I*, which in turn denied the prior Motion for Reconsideration; therefore, the current Petition/Motion is successive in nature. As Judge Whitehead's counsel note, it has been the law of Nevada for 125 years that a party will not be allowed to file successive petitions for rehearing. *See* Trench v. Strong, 4 Nev. 587, 589 (1868) ("it would be mischievous in the extreme to sanction the practice of filing a second petition for rehearing in any cause whatever, . . . except to correct a palpable error and grievous wrong"). "A second application for rehearing of a cause by the same party, after his petition for rehearing has been denied, will not be entertained." Brandon v. West, 29 Nev. 135, 142, 88 P. 140, 141 (1906). The obvious reason for this rule is that successive motions for rehearing "tend to unduly prolong litigation." *Id.* at 141, 88 P. at 140; *see also* State v. Butner, 67 Nev. 436, 438 n.2, 220 P.2d 631, 632 (1950), *cert. denied*, 340 U.S. 913 (1951); Ward v. Pittsburgh Silver Peak, 39 Nev. 80, 103, 154 P. 74 (1915).

## C. *The Petition/Motion is not authorized by NRAP 40*

As Judge Whitehead's counsel point out, the office of a valid petition for rehearing is described in NRAP 40(c), which provides as follows:

---

conclusion that, through application of the doctrine of collateral estoppel, might hereafter be invoked in some other tribunal to the detriment of the Commission's individual members.

[6]That is why, in *Whitehead I*, this court referred to such motion as a "pretext." In the Petition/Motion now before us, the Commission's counsel expresses dissatisfaction with our use of the word "pretext" to describe their motion. Given the evident lack of any discernable desire on their part to obtain an expeditious ruling, however, we do not feel that we unfairly characterized the facts. In any case, the significant fact was that no proper effort was made to have this court amend its ruling before defying it.

### (c) Scope of application; When Rehearing Considered.

(1) *Matters presented in the briefs and oral arguments may not be reargued in the petition for rehearing, and no point may be raised for the first time on rehearing.*

(2) The court may consider rehearing in the following circumstances:

(i) When it appears that the court has *overlooked or misapprehended a material matter* in the record or otherwise, or

(ii) In such other circumstances as will promote substantial justice.

(Emphasis added.)

The present Petition/Motion cannot be considered as proper under NRAP 40 as it does not address any "material matter" or ruling of this court. The Petition/Motion does not seek modification of any substantive ruling contained in *Whitehead I.* In *Whitehead I,* we carefully set out the basis for the court's jurisdiction over the Commission and referred to the powers of contempt vested in the court in proper cases. The Petition/Motion does not challenge these rulings, but, rather, merely asks the court to withdraw its opinion and to change what the Commission's counsel call "faulty assumptions, misstatements of fact and mischaracterizations of the legal arguments of Respondent." In fact, within three days after the Petition/Motion was lodged with the court, all Commission members and Commission counsel individually certified their intent to comply with the specific orders contained in *Whitehead I.* They did exactly that and, on March 18, 1994, the documents which we ordered to be produced for our *in camera* inspection were delivered to this court. Thus, all issues relating to the propriety of this court's orders respecting the production of documents for our *in camera* inspection are now moot.

■■■■■■

Rehearings are not granted to review matters that are of no material consequence. *See* In re Herrmann, 100 Nev. 149, 679 P.2d 246 (1984). In the *Herrmann* case, the respondent filed a petition for rehearing contending that the court's decision contained unnecessary statements and mischaracterizations. This court held that the rehearing petition failed to raise any *"germane* legal or factual matter" that had been previously raised and overlooked. *Id.* at 151, 679 P.2d at 247 (emphasis added). Therefore, this court observed that it appeared that the petition for rehearing had "been filed for purposes of delay, and with the improper result, if not the intent, of subjecting appellants to further public odium." *Id.* at 151, 679 P.2d at 247.

Similarly, in the present case, all of the points sought to be raised in the Petition/Motion are either immaterial, constitute attempts to reargue matters already considered and decided, or constitute efforts to raise new arguments for the first time. The Commission's counsel have recently decried our opinion in *Whitehead I* as "hostile and derisive," and further assert that if "undeniably erroneous assumptions of fact" are not corrected "an unnecessary scar will be forever imprinted upon the judicial history of Nevada and the citizens of Nevada will have been sadly disserved." Commission's Motion to Strike Answer at 3. No coherent attempt, however, has been made to show that any material issue was overlooked in our opinion in *Whitehead I.* Thus, as in *Herrmann,* it appears that the instant Petition/Motion has not been filed for any legitimate purposes countenanced by this court's rules. Rather, we tend to view such exaggerated and hysterical rhetoric as merely a transparent attempt to attract media attention and inflame public passion.

As noted by Judge Whitehead's counsel, the law relating to petitions for rehearing was summarized in the *Herrmann* case in the following terms:

> Under our long established practice, rehearings are not granted to review matters that are of no practical consequence. Rather, a petition for rehearing will be entertained only when the court has overlooked or misapprehended some material matter, or when otherwise necessary to promote substantial justice. NRAP 40(c)(2). A petition for rehearing may not be utilized as a vehicle to reargue matters considered and decided in the court's initial opinion. NRAP 40(c)(1); Gershenhorn v. Stutz, 72 Nev. 312, 306 P.2d 121 (1957). Nor may a litigant raise new legal points for the first time on rehearing. NRAP 40(c)(1); Cannon v. Taylor, 88 Nev. 89, 493 P.2d 1313 (1972); In re Lorring, 75 Nev. 334, 349 P.2d 156 (1960).

*Id.* at 151, 679 P.2d at 247. The court in *Herrmann* imposed sanctions against the movant for violating NRAP 40.

*Herrmann* controls the present case, as the Petition/Motion fails to raise any material point of practical consequence. The Petition/Motion fails to seek reversal or modification of any ruling relating to the court's jurisdiction or to its contempt powers and fails to direct attention to any factual or legal issue that was previously relied upon by the Commission, but overlooked by the court.

D. *In addition to being immaterial, and for other reasons not cognizable under NRAP 40, various contentions raised in the Petition/Motion will not withstand scrutiny in the light of established facts*

 1. *The record appears to repel immaterial contentions that the Commission members on their sole initiative, and unassisted by the Attorney General and Chief Deputy Brooke Nielsen, hired Special Deputy Attorney General/ Special Counsel Campbell*

In the Petition/Motion, the Commission contends that "the uncontroverted evidence discloses the decision to employ and the selection of special counsel Donald J. Campbell was made *solely* by the Commission, *not* by the Attorney General." Petition/ Motion at 6 (emphasis in original). Thus, according to the Commission, this court mischaracterized facts established by the record. Quite aside from the immateriality of this contention, it is not accurate.

On November 30, 1992, some nine months before the Commission gave any notice to Judge Whitehead that it was secretly proceeding against him, the Commission minutes show that Chief Deputy Attorney General Brooke Nielsen undertook to work with Commission member Alan Lefebvre to locate "outside counsel" to pursue the secret probe. Special Deputy Attorney General/ Special Counsel Campbell's billings show that Chief Deputy Attorney General Nielsen conferred with him on various occasions before he was hired.

After pursuing this endeavor with Commission member Lefebvre, Chief Deputy Attorney General Nielsen, on March 3, 1993, participated in another meeting on this subject that appears to be in violation of the Administrative and Procedural Rules for the Nevada Commission on Judicial Discipline ("ARJD"). Commission minutes show that only the chairman and Commission member Lefebvre were present at the March 3, 1993, meeting. As Judge Whitehead points out, ARJD 3(4) requires that a "quorum for the conduct of business other than the hearing and decision of formal disciplinary proceedings is four members." Although there was clearly no quorum for the March 3, 1993, meeting, one of the Commission members in attendance apparently tried to legitimate the meeting by claiming to have the "proxy" of Commission member "General Clark." This is a practice expressly prohibited by ARJD 3(9), but even if the "proxy" had been permissible, the meeting would still have been one member short of a quorum. ARJD 3(4). According to the

minutes, Commission member Lefebvre "suggested inviting Mr. Campbell to the 3/15/93 meeting for purposes of an introduction," and "all agreed." It is not clear from the minutes whether Chief Deputy Attorney General Nielsen was one of the "all" who voted at the meeting; however, she clearly was present at (and apparently approved of) this private conclave that was illegally conducted without a quorum.

On March 15, 1993, Chief Deputy Attorney General Brooke Nielsen and six Commission members, including the chairman, met and held a "general discussion re approval of Donald J. Campbell of Las Vegas to serve as a Special Deputy in this matter, *to serve as counsel in this matter in the place and stead of Brooke Nielsen and the Attorney General's office."* (Emphasis added.) It is not clear whether Mr. Campbell attended this meeting as was suggested in the March 3, 1993, minutes.[7]

Presumably in pursuance of the mentioned discussions, Attorney General Del Papa applied to the State Board of Examiners for the money to employ Campbell to serve as counsel *"in the place and stead"* of Chief Deputy Attorney General Brooke Nielsen and the Attorney General's office. The stated basis for the Attorney General's application to the Board of Examiners was the potential conflict of interest inherent in the Attorney General's continued representation of the Commission. On the Contract Summary, a form required for all contracts submitted for review by the Board of Examiners, the Attorney General stated specifically that "NRS 41.03435 provides for employment of special counsel if the Attorney General determines that it is impracticable, uneconomical *or could constitute a conflict of interest."* (Emphasis added.)

As Judge Whitehead's counsel note, however, the contract which the State executed with Campbell directly constitutes Campbell as a functionary or attaché of the Attorney General's office.[8] The contract between the State of Nevada, acting by and through the Attorney General, and Donald J. Campbell & Associates, entered into on March 25, 1993, recites in pertinent part that

---

[7]As Judge Whitehead mentions, one Anne Peirce, a former Commission employee who is not a Commission member and who had no apparent concern with the business at hand, was present during the discussions relating to Judge Whitehead. It appears that Chief Deputy Attorney General Nielsen, whose only justification for being present herself was to provide legal counsel, apparently did not direct attention to the fact that the unnecessary presence of any person at discussions relating to Judge Whitehead would violate the confidentiality to which he was entitled pursuant to article 6, section 21(5) of the Nevada Constitution and ARJD 5.

[8]*See* Motion for Appointment of a Master to Conduct Factual Investigation, Exhibit 2.

"[t]he Attorney General agrees to retain . . . Campbell . . . to serve as counsel to the Commission on Judicial [D]iscipline in [the Whitehead matter]." The contract further specifies that Campbell "shall serve in this capacity *at the pleasure of the Attorney General and shall report regularly to the Attorney General concerning the status of the above-named case.*" (Emphasis added.) The contract also provides that Campbell "shall provide litigation status reports to *the Attorney General,* as well as copies of memoranda, briefs, reports, studies, photographs, negatives or other documents or drawings prepared by [Campbell] in the performance of his obligations under this agreement." (Emphasis added.) Thus, while the Commission evidently considers Campbell as an independent special counsel to the Commission, it is nonetheless contractually clear that Campbell serves at the pleasure of theAttorney General and is contractually bound to supply all records and litigation reports to the Attorney General rather than the Commission.

Moreover, the record reflects that Mr. Campbell was sworn in as a "special deputy Attorney General." Campbell averred in an affidavit dated July 28, 1993, "After I acquiesced to act as special counsel for the Commission, I was officially appointed to the position of special deputy attorney general by Frankie Sue Del Papa, Attorney General of the State of Nevada." In another affidavit dated October 11, 1993, Campbell declared: "Although I was later officially appointed to the position of Special Deputy Attorney General, I did not discuss with or share any of my factual findings with any member of Attorney General Del Papa's staff to ensure that the investigation was not tainted by any personal feelings of bias in favor of or prejudice against Judge Whitehead."

In Attorney General Del Papa's press release of November 12, 1993, the Attorney General said:

> In the Whitehead case, both the Commission *and the attorney general* felt it would be appropriate to have outside, independent counsel to investigate the many complaints which the Commission had received against Judge Whitehead.[9]

Later in the release, the Attorney General stated: "Under NRS 41.03435, the Attorney General may employ outside counsel, with the approval of the Board of Examiners . . . ." Thus, contrary to the Commission's present contention, the record

---

[9]*See* Motion for Protection of Petitioner's Due Process Rights, Exhibit "D."

before this court does *not* contain "uncontroverted evidence" disclosing "that the decision to employ and the selection of special counsel Donald J. Campbell was made *solely* by the Commission, *not* by the Attorney General." Petition/Motion at 6 (emphasis in original).

We may have occasion to address this subject further at a later date in the course of disposing of other pending motions. We note, however, that for purposes of this interlocutory opinion, the Attorney General, the Chief Deputy Attorney General, and Special Deputy Attorney General/Special Counsel Campbell have signed virtually all filings presented to this court in these proceedings. It is apparent that all three individuals share the views expressed in those filings, thus completely blurring allegations that there have been no cross-communications concerning the investigative activities of Campbell, who is contractually obligated to submit litigation status reports to the Attorney General while serving "at the pleasure of" the Attorney General.

We therefore must emphatically reject the Petition/Motion's contention that "the uncontroverted evidence" discloses that the decision to employ special counsel Donald J. Campbell was made "*solely* by the Commission." Even if the point were material to our *Whitehead I* Opinion, we would have to deny any rehearing or clarification to "reconsider" this unfounded contention, and we decline to amend or correct our prior opinion.[10]

2. *The record also appears contrary to the Petition/ Motion's immaterial contention that Donald J. Campbell should be viewed as a "special counsel" to the Commission rather than as a "special prosecutor," which is how our* Whitehead I *Opinion characterized him*

For reasons not immediately apparent to us, the Petition/ Motion complains that our opinion in *Whitehead I* referred to Mr. Campbell in an incorrect manner. The Petition/Motion informs us that the Commission is at a loss to understand how its special counsel has been transformed in the *Whitehead I* Opinion into a so-called "special prosecutor."

Our reason, of course, was that Mr. Campbell apparently has

---

[10]As Judge Whitehead's counsel note, the record indicates that the Commission members may have engaged in private, off-the-record discussions with Campbell, in some instances even before he was formally retained. Consequently, there may well be grounds for their belief that they selected Campbell as the person that *they* wanted to investigate and prosecute Judge Whitehead. Such fact, however, would not affect the conclusion reached in *Whitehead I,* that Campbell was hired by the Attorney General's office to serve as a special prosecutor in this matter.

been performing functions analogous to those which ARJD 16 contemplates are to be performed by a "prosecuting attorney" or "prosecutor," although, arguably, prematurely.[11] This is consistent with the nomenclature employed in Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992), except that, under ARJD 16, it appears that the Commission is only authorized to designate a special prosecutor after probable cause for disciplinary action has been found to exist after a probable cause hearing. Special Deputy Attorney General/ Special Counsel Campbell, despite ARJD 16, was hired and undertook to act prior to such a hearing. We therefore deem the reference made to Mr. Campbell in *Whitehead I* as appropriately descriptive. Nonetheless, because the Commission and the Commission's counsel have apparently taken offense at our prior reference to Campbell as a "special prosecutor," we have referred to Campbell in this opinion as Special Deputy Attorney General/Special Counsel Campbell, the designation which Campbell himself has employed in numerous motions and papers filed and submitted in this court. We remain at a loss, however, to discern how any of this relates to any material matter in *Whitehead I* warranting our rehearing, amendment, or correction.

In *Whitehead I* we also noted as follows:

> In sharp contrast to the role that Attorney General Del Papa has assigned herself to play in the present case, Attorney General McKay permitted the independent "special prosecutor" hired by the Commission in *Goldman* to perform his function as independent counsel to the Commission without interference or "guidance" from Attorney General McKay. This, of course, enabled Attorney General McKay to avoid generating the kinds of conflicts that would have been present if he had simply used a "special prosecutor" as an attaché and special deputy attorney general to help him pursue ends that he may have desired to see realized.

110 Nev. at 148, 869 P.2d at 807.

Again, for reasons not readily discernable, the Petition/Motion appears to identify the above-quoted passage both as inaccurate and insulting. It complains as follows: "The *derogatory characterization* of special counsel as an 'attaché' utilized for *improper*

---

[11]ARJD 16 provides in material part:

In all cases in which probable cause for disciplinary action is found by the commission, the commission must designate a prosecuting attorney who must sign and file with the commission a formal statement of charges signed under oath by the prosecuting officer. Thereupon, confidentiality ceases. . . .

*purposes* for furthering the Attorney General's *personal goals* is unfounded and unwarranted." Petition/Motion at 6 (emphasis added).

We believe that the foregoing complaint demonstrates inordinate and unexpected sensitivity on the part of the Commission's counsel. In the first place, the above-quoted passage makes no direct reference to Mr. Campbell; the allusion was to Mr. McKay's practice. Also, use of the word "attaché" is not derogatory in any sense, even if construed as a reference to Mr. Campbell. As Judge Whitehead's counsel point out, the word "attaché" commonly carries the connotation of "technical expert," Webster's Ninth New Collegiate Dictionary 113 (9th ed. 1983); and on the form she submitted to obtain funds to hire Mr. Campbell, Attorney General Del Papa stated that she had chosen him because of his "special expertise." We therefore fail to see either insult to or mischaracterization of Mr. Campbell.

Next, it should be noted that the portion of our *Whitehead I* Opinion quoted above does not, as the Petition/Motion intuits, include any references either to "improper purposes" or to "personal goals" of the Attorney General. It therefore appears to us that the perceived inaccurate slights over which the Petition/ Motion expresses outrage have not occurred, and there is nothing we could or should rehear, amend, or correct in this regard.

> 3. *The Petition/Motion's immaterial suggestion that disobedience of this court's October 4, 1993, order was justified by a difficult situation in which the Commission members found themselves is not supported either by applicable law or by the record*

In the Petition/Motion, there is an expression of a desire to clarify (and presumably to have this court clarify) that the letter of October 14, 1993, stating the Commission's decision to defy this court's order, "was prompted by the Commission's concern for maintaining the confidences of cooperating witnesses." Confidentiality had been guaranteed to cooperating witnesses on behalf of the Commission by Special Deputy Attorney General/Special Counsel Campbell. The Commission further represents that the letter of October 14, 1993, was prompted by the "Commission's concern for maintaining the integrity of the judicial discipline process." The Commission states that it "was truly frustrated in its ability to comply with the Court's October 4, 1993, Order and yet still maintain faith with the witnesses." According to the Commission, its "desire to protect the confidentiality of privileged material [under the attorney-client and work-product privileges], the confidences of witnesses, and the integrity of its

discipline proceedings, formed the bases for filing the Commission's Motion for Reconsideration and issuing the Commission's letter of October 14, 1993." *See* Petition for Rehearing at 3-4.

This statement suggests that the Commission members and the Commission's counsel still do not appreciate the legal principles carefully delineated in *Whitehead I,* namely: the Commission members are obligated to follow faithfully the orders of this court, as well as all rules promulgated pursuant to the court's constitutional authority. Nothing in the ARJD vests a special counsel or prosecutor with any right or discretion to promise a prospective witness "confidentiality" in a way that will effectively preclude an accused judge from gaining access to information that will equip the judge either to confront and cross-examine potential accusers or otherwise to assemble evidence relating to any material issue, such as arguable excesses in the exercise of the Commission's jurisdiction.

With all due respect to the Commission members, we are therefore obliged to say that, while their concerns for witnesses promised confidentiality may have been real and sincerely motivated, they were not "legitimate," as the Petition/Motion characterizes them, but, rather, the unfortunate result of commitments which may have been improperly undertaken by Special Deputy Attorney General/Special Counsel Campbell in violation of the ARJD.[12]

---

[12]In *Whitehead I,* we pointed out that Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992), was, by its express terms, decided under the now-withdrawn "revised interim rules," rather than under the current ARJD. It should perhaps be added that the Editor's Note to ARJD 1, comments:

> The Supreme Court Order adopted April 29, 1988, effective April 29, 1988, provided that "the Revised Interim Procedural Rules of the Nevada Commission of Judicial Discipline filed January 10, 1978, are hereby superseded, *except as to cases in which formal hearings have already been ordered or conducted under the provisions of the Revised Interim Procedural Rules.*"

Nev. Rev. Stat. Ann., Court Rules Ann. (Michie 1994) (emphasis added).

We note also that in *Whitehead I* we pointed out that "the *Goldman* case (a) involved an appeal and not a writ proceeding challenging jurisdiction; (b) was decided under an entirely different set of less-definitive rules; and (c) raised and decided issues that were not remotely coincident with those here involved. It therefore is not relevant judicial precedent." *Whitehead I,* 110 Nev. at 148, 869 P.2d at 808. The point under discussion provides a good example of what we were then expressing in *Whitehead I.* Although the Commission's counsel suggest in the instant Petition/Motion that they feel the *Goldman* decision showed an intent to provide "substantive and procedural guidance" that legitimated their actions concerning Judge Whitehead, the prosecutor in *Goldman* did not promise any witness or informant "confi-

The Commission should also understand that its inconsistency and inflexibility regarding considerations of confidentiality have posed substantial concerns to this court. For example, the Commission never once tendered an objection to the initial orders of this court requiring confidentiality in these writ proceedings until *after* the confidentiality of the proceedings was breached and the Las Vegas Review-Journal began publishing a series of articles disclosing information provided by unnamed sources regarding the confidential proceedings. These prejudicial disclosures to the media by unnamed sources were made not only in direct violation of a lawful order of this court, but also in direct violation of ARJD 5(1) which implements a constitutional mandate.[13]

Although it had previously tendered no protest whatsoever to the court's order of confidentiality, upon the publication of these unlawful disclosures, the Commission and its counsel almost immediately began presenting arguments vehemently decrying the "secret" supreme court proceedings. Of course, by then, it had become quite apparent that such arguments would receive substantial media attention if the apparently well-informed, unnamed sources chose to leak the substance of such arguments to the media.

In a document filed on October 27, 1993, the Commission's counsel disingenuously asserted that this court's initial "confidentiality order [was] not valid since it binds only [the Commission] and is contrary to NRS 1.090 which requires proceedings before this Court to be open and public."[14] *See* Commission's "Response to Emergency Request for Permission to Make Public Statement," filed October 27, 1993, at 1. The Commission also argued:

---

dentiality," and no point regarding any such promise was decided in *Goldman*. We therefore find it impossible to comprehend the Commission's counsel's recurrent references to *Goldman* in attempting to legitimate any and all of their alleged procedural derelictions under the ARJD. Promises of "confidentiality" to witnesses and informants, and various other possible violations of the current rules, are simply innovations of the Commission's counsel that never occurred and were never approved in *Goldman*.

[13]ARJD 5(1) provides: "All proceedings must be confidential until there has been a determination of probable cause and a filing of formal statement of charges."

[14]The Commission's counsel neglected to mention that NRS 1.090 provides in pertinent part: "The sitting of every court of justice shall be public *except as otherwise provided by law* . . . ." (Emphasis added.) Of course, this court had previously concluded that confidentiality in this matter was indeed "otherwise provided by law." *See* Nev. Const. art. 6, § 21(5)(a) (the supreme court shall make appropriate rules for "[t]he confidentiality of all

> [The Commission] does not oppose Petitioner's request [for permission to make a public statement]. However, in accordance with the law requiring public proceedings in this Court, and in fairness to all parties as well [as] the citizens of Nevada, *the secrecy shrouding these proceedings should be lifted.*

*Id.* at 2 (emphasis added).

Thus, in one breath, the Commission decried the "secrecy shrouding these proceedings." Yet, in another breath, it opposed with equal ardor and vehemence this court's undertaking a review, even *in camera* of materials secretly assembled by the Commission's counsel, in order to ascertain if such materials are properly subject to discovery under ARJD 14(5). While this court fully appreciates that maintenance of the faith and confidences of witnesses may have been of concern to the Commission, this court is nonplussed by the Commission's active opposition to considerations or actions designed to address or correct blatant violations of Judge Whitehead's preeminent right to confidentiality. Thus, to us, it seems that the Commission has abdicated its obligation to assure Judge Whitehead's right of confidentiality prior to a finding of probable cause, and has demonstrated a singular lack of concern for the unlawful, premature disclosures of confidential information obviously designed to disparage and tarnish Judge Whitehead, as well as this court.

Although confidentiality in judicial discipline proceedings is thought to encourage the filing of complaints and the willing participation of witnesses, ARJD 14(5) provides:

---

proceedings before the commission, except a decision to censure, retire or remove a justice or judge"); ARJD 5(1) (all proceedings must be confidential until there has been a determination of probable cause and a filing of a formal statement of charges).

It should have been apparent that disclosures relating to the proceedings in this court also necessarily involved disclosures relating to the proceedings before the Commission. This court had concluded that Judge Whitehead was not required to waive his right to confidentiality under the Nevada Constitution and the Commission rules in order to seek extraordinary relief in this court challenging the Commission's jurisdiction as provided in ARJD 40(7).

Judge Whitehead's right to absolute pre-probable cause confidentiality is grounded in the Constitution of this state. The United States Supreme Court has held that prosecutorial comments and jury instructions regarding a defendant's silence are Fifth Amendment violations because such comments and instructions constitute a penalty for exercising a constitutional privilege that "cuts down on the privilege by making its assertion costly." Griffin v. California, 380 U.S. 609, 614 (1965). By a parity of reasoning, permitting Judge Whitehead to invoke the right accorded him under ARJD 40(7) (a rule adopted by this court pursuant to constitutional mandate) only if he forfeits his right to confidentiality mandated by the Nevada Constitution would be an intolerable penalty.

> In preparing to oppose a determination of probable cause, the respondent [judge] has the right to inspect all records of the commission relating to the disciplinary action against the respondent [judge] and to be fully advised as to the contents of the administrative record considered by the commission determining that there was sufficient reason for a probable cause hearing.

Emphasizing again the primary importance of confidentiality to a respondent judge, it has been noted that confidentiality also *"protects judges from the injury which might result from publication of unexamined and unwarranted complaints."*[15] *See* Landmark Communication, Inc. v. Virginia, 435 U.S. 829 (1978) (emphasis added).

For reasons noted above, this court has remained gravely alarmed that, based upon all filings and other indicia of attitude and objectives we have received, the Commission has not only taken no action to discover the source of the unlawful leaks to the media,[16] but has actually *opposed* Judge Whitehead's pleas to this court to determine the unethical sources of the leaks. Thus, while certain members of the Commission and counsel have indicated that they have not directly discussed confidential matters with members of the media, we emphasize our alarm over the Commission's apparent lack of interest in the improper and unethical disclosures that have so distorted and delayed the progress of these proceedings. In any event, we conclude that, when balanced against Judge Whitehead's rights and the significant public disclosures that have already occurred, this court's private, *in camera* review of the materials in question will not unduly offend the policy against disclosure of witness confidences.[17]

4. *The Petition/Motion's immaterial explanations concerning the improper misquotations of Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d*

---

[15]*See also* Shaman, Lubet and Alfini, *Judicial Conduct and Ethics*, § 13.15 at 419 (1990) ("exoneration rarely commands the same attention as a charge of wrongdoing"; a judge's reputation may suffer needlessly from early public disclosure). A review of this treatise also reveals that twenty-eight states plus the District of Columbia evidently have a more stringent confidentiality requirement than is presently required in Nevada under ARJD 5. The above-referenced treatise states that ten jurisdictions "permit public disclosure only where a supreme court orders a sanction." *Id.* § 13.15 at 417.

[16]At least this court has not been advised of any such action.

[17]It should not escape anyone's attention that any witnesses produced by a special prosecutor must be identified to the respondent judge in any event. *See* ARJD 14(5) and 21(1)(a).

*107 (1992), made by Commission's counsel do not persuade us that our* Whitehead I *Opinion mischaracterized such behavior*

In *Whitehead I,* the court discussed a misquotation that the Commission's counsel had fabricated out of seven sentences that span nine pages and two independent sections of our *Goldman* Opinion. This court essentially rejected arguments based on the misquotation. Now, in the Petition/Motion before us, the Commission's counsel attempt to justify the misquotation in the following manner: "Counsel for the Commission respectfully state that the ellipses and the notation 'Emphasis added' were inadvertently omitted and that there was no intent to mislead." (The prosecutors also attempt to justify an obscure citation to a year-old slip opinion, even though the bound Pacific Reporter volume was accessible, by saying the official Nevada Reporter was not yet available.)

In *Whitehead I* we simply stated the facts relating to the Commission's counsel's conduct. We did not try to define its ethical quality. *Whitehead I,* 110 Nev. at 148, 869 P.2d at 807-808. We do not do so now. To whatever extent our Opinion in *Whitehead I* may warrant clarification in light of the Commission's counsel's explanations, that now has been provided by reciting those explanations, and we leave it to members of the bar and other readers to judge the veracity of the explanations after reviewing the misquotations in question.[18]

We note, however, that the Commission's counsel make no effort to explain the apparent attempt to mislead this court into believing that our intervention in this proceeding was premature by repeatedly quoting the statement from *Goldman* that "[t]he proceedings before the commission must be permitted to run their full constitutional course from their inception to their conclusion." 108 Nev. at 275, 830 P.2d at 123.

The referenced quotation was taken completely out of context, and counsel deleted the immediately preceding sentence which states:

> Thus, where, as here, allegations of judicial misconduct provide an incipient basis for commission action under the state constitution, overriding concerns of public and social policy, as well as the commission's preeminent constitutional authority to resolve all potential questions of misconduct and entitlement to early, enhanced disability retirement,

---

[18]We do not pass judgment as to whether the described miscitation and misquotation were deliberately designed to mislead the court or merely represents an incapacity to cite cases in a proper and acceptable manner.

must foreclose any attempt *by a judge to compel the governor to act in accordance with NRS 3.092(3).*

*Id.* (Emphasis added.)

Clearly, the sentence quoted by the Commission's counsel had no reference whatever to the jurisdiction of this court to entertain an interlocutory challenge to the Commission's jurisdiction. Rather, the sentence emphasized that a respondent judge could not short circuit the Commission's jurisdiction to hear a matter involving mixed issues of misconduct and enhanced disability retirement entitlement by invoking the governor's statutory authority respecting enhanced early retirement. Indeed, the Commission's counsel's apparent attempt to mislead this court by selective quotes from *Goldman* is underscored by the belated claim that "the Commission has consistently recognized the Court's authority under ARJD 40(7) to review '**interlocutory orders**' of the Commission." (Emphasis in original.) Even the latter contention is highly suspect on its face because of Commission statements cited within the body of this opinion coupled with the fact that this proceeding is the first invoking this court's jurisdiction under ARJD 40(7).[19]

> 5. *The Commission's revised position regarding this court's jurisdiction to intervene under ARJD 40(7) does not warrant amendment of this court's Whitehead I Opinion*

The Commission concurrently argues in this Petition/Motion:

> It is not the position of Respondent, nor has it ever been the position of the Commission or its counsel, nor has it been argued, that the Court's appellate authority in a judicial discipline matter is limited solely to review of a "final order." Respondent notes that the Commission has consistently recognized the Court's authority under ARJD 40(7) to review "**interlocutory orders** of the commission." It has, however, consistently been the argument of the Commission and counsel that this extraordinary writ proceeding and the Court's intervention are premature since the Commission

---

[19]Concerning the duty of counsel to refrain from distorting quotations by selective omissions, those interested may wish to review Montgomery v. City of Chicago, 763 F. Supp. 301, 307 (N.D. Ill. 1991); Kloster Speedsteel AB v. Crucible Inc., 793 F.2d 1565 (Fed. Cir. 1986), *cert. denied sub nom.* Stora Kopparbergs AB v. Crucible Inc., 479 U.S. 1034 (1987); Amstar Corp. v. Envirotech Corp., 730 F.2d 1476, 1476 (Fed. Cir. 1985), *cert. denied,* 469 U.S. 924 (1984).

has yet to issue a single **interlocutory order** in the White-head matter.[20]

Petition for Rehearing at 12 (emphasis in original).

Thus, the Commission now contends that it has never entered any interlocutory orders in this matter, and therefore, this court's intervention is premature. More specifically, the Commission apparently argues that this court lacks jurisdiction to entertain petitions for extraordinary relief filed pursuant to ARJD 40(7) which seek review of decisions or activities of the Commission that have not been memorialized in formal, written "interlocutory orders of the commission."[21]

The minutes of a July 2, 1993, conference of the Commission disclose that: "Commissioner Lefebvre moved to approve the Complaint for Probable Cause and for service of same . . . . Commissioner Clark seconded the motion. Motion carried." This ruling was memorialized in the July 12, 1993, "Notice of Probable Cause Hearing," which was file-stamped by the Commission's secretary, signed by Special Deputy Attorney General/ Special Counsel Donald J. Campbell, and served on Judge White-head. The Notice advised Judge Whitehead that, pursuant to ARJD 14, a complaint had been filed against him and that he was "required to respond" to the complaint "in writing, within thirty (30) days." The Notice further advised Judge Whitehead that a probable cause hearing would be held on September 7, 1993, that Judge Whitehead could call witnesses only with the permission of the Commission, and that a request for such permission had to be filed not later than fifteen days prior to the hearing. In point of fact, Judge Whitehead was in every sense "ordered" to respond to the complaint within thirty days. He was given no choice in the

---

[20]As Judge Whitehead observes, the media would do well to review this *current contention closely and then compare it to the press release* issued by Attorney General Del Papa on January 31, 1994, wherein the Attorney General stated: "Constitutionally created as an entity separate from any court, and *not under the control of the judiciary except as to review of its final decisions,* the Commission has the authority and duty to investigate and prosecute disciplinary actions concerning allegations of misconduct by judges." (Emphasis added.)

[21]ARJD 40(7) provides:

Review of interlocutory orders of the commission, which are considered *either by the prosecuting officer or the respondent judge* to be without or in excess of jurisdiction, may be sought by way of a petition for an appropriate extraordinary writ.

(Emphasis added.)

matter. This court will recognize a document for what it is, rather than the name assigned to it.

Hence, there is no dispute that at the conference of July 2, 1993, the Commission voted and *ruled that there was sufficient cause to hold a probable cause hearing pursuant to ARJD 14(1)*.[22] There is also no dispute that Judge Whitehead was served with notice of the Commission's decision to proceed to a probable cause hearing when, pursuant to ARJD 14(1), the chairman "cause[d] prompt written notice to be given" to Judge Whitehead of the Commission's decision. Yet, the Commission disingenuously insists that its actions to date with respect to Judge Whitehead are not reviewable by this court because no interlocutory orders have ever been issued by the Commission in this proceeding.

If, as the Commission apparently now insists, this contention forms the principal basis for the Commission's challenge to this court's jurisdiction, then indeed this court has gravely misconstrued the significance, thrust and import of the Commission's arguments. Had the Commission's prior filings clearly conveyed that the Commission's jurisdictional contentions were based upon such an insubstantial predicate, this court would have rejected the contention as wholly untenable long ago. A review of the arguments advanced by the Commission, however, in the now public papers and documents filed in this proceeding, amply demonstrates that the Commission's challenge to this court's jurisdiction in this matter stemmed from assertions far beyond the simplistic claim that no interlocutory order had ever been entered by the Commission.

Although the Commission now insists that it has consistently recognized this court's authority to entertain a petition under ARJD 40(7), and that its letter of October 14, 1993, "was not intended as a personal reflection upon the Court," we anticipate that, upon further reflection, the Commission may appreciate that there was substantial cause for this court to labor under a far different perception. The following examples may serve to remind the Commission of the thrust, tone and tenor of many of its prior arguments.

In the Commission's letter of October 14, 1993, the Commission informed this court:

---

[22]ARJD 14(1) provides:

The commission will consider all complaints brought before it with a view to determining whether or not there exists sufficient cause to proceed to a probable cause hearing. In cases in which the commission determines that there is merit to the charges and that there is sufficient reason for a probable cause hearing, the chairman must cause prompt written notice to be given to the respondent that the respondent is required to respond to the sworn complaint in writing within 30 days after service.

> The Commission cannot in law, nor in good conscience, abandon its constitutional post in the face of *an assault by a series of secret, illegal and void "orders."* To acquiesce in this *most recent attempt to emasculate and usurp the separate constitutional powers of the Commission would violate the oath which each of the undersigned has sworn to fulfill.*

(Emphasis added.)

Having referred to the court's orders as "a series of secret, illegal and void 'orders,'" designed to "emasculate and usurp the separate constitutional powers of the Commission," and having flatly refused to comply with an order of this court, surely the Commissioners can now appreciate how the court came to understand the Commission's position as a serious confrontation to the court's fundamental, constitutional power and authority to act in this matter.

In another document filed on October 27, 1993, the Commission told this court:

> Petitioner has requested striking Respondent's answer to the petition and other sanctions. Respondent respectfully submits that sanctions may not be imposed since *the Court does not have jurisdiction over the petition.*

*See* "Respondent's Opposition to Motion to Strike Response to Petition and Issue Permanent Writ of Prohibition and/or Mandamus and for Sanctions" at 1 (emphasis added). Thus, the Commission contended that this court did not even have the power to sanction the Commission for conduct in direct defiance of a court order!

In the same document, the Commission stated:

> *As Respondent has previously argued, this Court has no jurisdiction in this matter.* If Nevada's system of judicial accountability is to operate as intended under the Constitution, then it must do so without fear of interference or intimidation by the courts. The Commission is a constitutionally created entity whose independent jurisdiction cannot be invaded in the fashion requested by Judge Whitehead.

*Id.* at 3 (emphasis added).

In a "Motion for Reconsideration of Confidential Order," filed by the Commission on October 12, 1993, the Commission argued:

> [A]n *in camera* inspection by the Court of the entire investigative file in this matter is in excess of the Court's jurisdiction . . . .

*Id.* at 1.

The Court's order and its proposed action in reviewing the items listed in the order is an *invasion of the Commission's constitutionally-prescribed function and therefore a violation of Nev. Const. Art. 6, Sec. 21.*

*Id.* at 4 (emphasis added).

This Court has acknowledged that its constitutional role in proceedings concerning alleged judicial misconduct is *limited to an appellate review of the factual record created by the Commission.*

*Id.* at 4 (emphasis added).

Many authorities have noted that their respective commissions are *independent constitutional bodies and as such the courts have no authority to interfere with their constitutional functions.*

*Id.* at 5 (emphasis added).

[T]o the extent that the Court seeks to insert itself into the preliminary investigation function which Nevada's Constitution assigns solely to the Commission, the Court violates Nev. Const. art. 6, § 21.

*Id.* at 6.

Moreover, in a document filed October 18, 1993, *opposing* Judge Whitehead's motion for an investigation to determine the source of leaks of confidential information to the press and *opposing* Judge Whitehead's request that this court institute contempt proceedings against the person or persons who violated the Commission Rules of Confidentiality, as well as this court's orders respecting confidentiality, the Commission argued: *"The Commission is not subject to the plenary authority of this Court."* See "Respondent's Opposition to Motion for an Order to Show Cause and Objection to this Court Presiding Over this Matter, NRS 22.030(3)" at 2 (emphasis added). Further, the Commission insisted: "Simply stated, judicial commission rules do not give this Court the authority to conduct its proceedings in secret." *Id.* at 3.

Thus, this court understood the thrust of the Commission's jurisdictional contentions to be far more confrontational in a fundamental constitutional sense than is currently indicated by the Commission. This court certainly did not imagine that the Commission's strident public assault on this court's power to act had been launched and sustained only by an anemic argument that the alleged absence of an interlocutory order foreclosed this court's intervention under ARJD 40(7).[23]

---

[23]Among other indicia of the public position that has been maintained, at least by the Commission's counsel, is a press release issued on January 31,

With respect to that contention, it should be noted initially that ARJD 40(7) does not by its terms expressly provide that a "written order" is a formal prerequisite to the filing of a petition challenging Commission action. Even assuming, however, that ARJD 40(7) could be interpreted to require a written order as a jurisdictional prerequisite to a petition challenging a Commission ruling that a probable cause hearing should be held—a critical stage in any disciplinary proceeding—the written "Notice of Probable Cause Hearing" of July 12, 1993, which was signed by Special Deputy Attorney General/Special Counsel Campbell and file-stamped by the Commission's secretary, constitutes adequate written indicia of the Commission's interlocutory determination. The Notice memorializes the Commission's vote and decision, and as such it establishes, in the manner provided by ARJD 14(1), that the Commission formally ruled that there was sufficient "merit to the charges and that there [was] sufficient reason for a probable cause hearing . . . ." *See* ARJD 14(1).

To conclude that such a ruling is not challengeable under ARJD 40(7) as an "interlocutory order of the commission" would lead to absurd results. By simply declining to issue written rulings, the Commission could avoid this court's power to arrest illegal proceedings called to the court's attention by either a prosecuting officer or an accused judge. Such an interpretation would render ARJD 40(7) meaningless and would be wholly inconsistent with any reasoned concept of due process of law.

Moreover, in a document *signed by all of the Commissioners* and filed by the Commission in this court on September 10, 1993, this court was advised by the Commission:

[P]etitioner has been provided with a copy of the portions [of] minutes of all meetings of the Commission which reflect

1994, by the Attorney General wherein this court was publicly degraded in the following vitriolic terms:

The extraordinary actions taken by Judge Jerry Carr Whitehead and Nevada Supreme Court Justices Thomas Steffen and Charles Springer to block proper legal review of certain complaints of judicial misconduct have precipitated an unprecedented constitutional crisis . . . .

The press release goes on to state:

Constitutionally created as an entity separate from any court, *and not under the control of the judiciary except as to review of its final decisions,* the Commission has the authority and duty to investigate and prosecute disciplinary actions concerning allegations of misconduct by judges.

*See* Exhibit 2 to the Affidavit of Vivian Lynch at 2 (filed March 11, 1994) (emphasis added). It is therefore readily apparent that the current representations about the Commission's prior position on this subject are not only immaterial but untrue, and appear to have been manufactured for the purpose of persuading someone other than justices of this court. The current representations do not warrant any correction of our *Whitehead I* Opinion.

discussions of the complaints against Judge Whitehead, up to and including the Commission meeting held on July 2, 1993. As indicated in the minutes, *the Commission reviewed the proposed complaint seeking determination of probable cause at their conference on July 2, 1993. After review of the said complaint and in consideration of the many complaints, documents, exhibits and other matters enumerated in the affidavit of Eve King, the Commission voted to hold a probable cause hearing.*

All of the foregoing constitutes the records of the Commission regarding Petitioner Whitehead, and details all matters which were *considered by the Commission in deciding to hold a probable cause hearing in accordance with ARJD 14.* . . . Thus, petitioner has been fully advised "as to the contents of the administrative record *considered by the commission determining that there was sufficient reason for a probable cause hearing.*"[24]

(Emphasis added.) *See* Commission's Notice of Compliance with Confidential Order, filed September 10, 1993.

This Notice of Compliance, which we emphasize is signed by all of the Commissioners, also quite clearly memorializes in written form the Commission's decision of July 2, 1993, to hold a probable cause hearing. The Notice of Compliance constitutes written confirmation of a ruling of the Commission that is subject to review under ARJD 40(7). We again stress in no uncertain terms, that Judge Whitehead was "ordered" by the Commission, through Campbell, to respond to the complaint within thirty days.

▪▪▪

Finally, it should be emphasized that even in the absence of any written indicia of the Commission's interlocutory rulings, this court has the power under the Nevada Constitution to intervene in Commission proceedings by way of an extraordinary writ in appropriate circumstances. *See* Nev. Const. art. 6, § 4 (supreme court shall have power to issue writs of *mandamus, certiorari, prohibition, quo warranto,* and *habeas corpus*). The court's opinion of February 18, 1994, made this point quite emphatically.

▪▪▪

Mandamus may lie to compel *any* act which "the law especially enjoins as a duty resulting from an office, trust or station."

---

[24]We note that, in addition to requiring the Commission to fully advise an accused judge of the contents of the administrative record, ARJD 14(5) provides that the accused judge has "the right to inspect all records of the commission relating to the disciplinary action . . . ."

NRS 34.160. It is frivolous to contend that the writ is available only to compel a duty "resulting from an office, trust or station," concerning which the office holder has entered a formal order refusing to perform. Mandamus also may lie to compel the admission of a party to the use and enjoyment of any "right of office to which he is entitled and from which he is unlawfully precluded." *Id.* Again, it is untenable to suggest that the writ lies solely when the right precluded has been foreclosed by a formal order, as contrasted with informal action or inaction.

Prohibition is the counterpart of mandamus and "arrests *proceedings* of any tribunal, corporation, board or person exercising judicial functions, when such proceedings are without or in excess of jurisdiction." NRS 34.320 (emphasis added). *See also* Nicholson v. State Com'n on Judicial Conduct, 409 N.E.2d 818, 822 (N.Y. 1980) (concluding that prohibition was available to challenge commission proceedings as in excess of commission's power). The statute does not support the Commission's current argument that to be reviewable by prohibition, the proceedings in excess of jurisdiction must somehow culminate in an order. If this were the law, the Commission could forever forestall attempts by an accused judge or a prosecuting officer to invoke this court's review of the worst possible kinds of abuses simply by omitting to formalize any of their activities in an official "order," final or otherwise.

Despite the foregoing concerns regarding the nature of the Commission's challenge to the legitimate jurisdiction of this court, the Commission has sought to disabuse this court of any position calculated to be an affront to this court. We are informed that any language appearing to be contemptuous or an affront was the product of the Commission's fervor. We respect the Commission's fervor, but are disappointed that the Commission and its counsel have seemed to perceive bias or gamesmanship, rather than a genuine approach to legitimate issues, by or among the members of this court. Hopefully, the Commission and the public will appreciate why it has appeared to this court that the Commission's counsel has been publicly attempting to arrogate to the Commission a preeminent right of judicial review which this court could not in any sense countenance. In any event, we conclude that no clarification of our *Whitehead I* Opinion is necessary, and that entry of a formal order is wholly immaterial to whether or not this court can consider issuance of an interlocutory writ when abuse of the Commission's powers has allegedly occurred.

### 6. *No correction or amendment of this court's order for* in camera *inspection of documents is warranted*

As previously mentioned, reargument of contentions already decided is violative of NRAP 40(c)(1), and, additionally, any objection to delivery of the material in question, which already has occurred, is immaterial and moot. Aside from this, the Petition/Motion's contentions are lacking in validity.

In *Whitehead I,* we directed the Commission members and counsel for the Commission to advise the Clerk of this Court individually on or before March 11, 1994, as to whether they would or would not comply with the order of this court directing submission of materials for this court's *in camera* review. On March 8, 1994, the Commission submitted the instant Petition/ Motion, along with a motion for leave to file the petition in excess of ten pages. On March 11, 1994, the Commission members and counsel complied with our directive and notified the Clerk of this Court that they would produce the documents in issue. Following the submission of the instant Petition/Motion, the Commission, on March 18, 1994, did in fact submit materials for this court's *in camera* review. At no time, following the issuance of the *Whitehead I* Opinion, did the Commission tender to this court any request for a stay of the court's directive requiring the submission of materials for the court's *in camera* review. Thus, to whatever extent that Commission now contends that the work-product or attorney-client doctrines protect the matters in issue from this court's *in camera* review, such a contention is not only improperly successive in nature, but it has been rendered moot.

Such claims also lack any apparent legal validity. The purpose of the attorney-client privilege is to protect confidential communications between attorney and client. NRS 49.095. Campbell and the Commission members deny any communication between them as to the content of the documents in question; consequently, no bases appear for a valid claim of attorney-client privilege with respect to these documents. (This, would be so of course, even assuming that there is actually an attorney-client relationship between Mr. Campbell and the Commission given his apparent assumption of an investigative and prosecutorial role before the Commission.)

This court ordered production of documents for its *in camera* review to determine the range and scope of the "preliminary investigation" conducted by Special Deputy Attorney General/ Special Counsel Campbell, an issue still pending in this proceed-

ing which was not decided in *Whitehead I* and which is not decided now. Therefore, our *Whitehead I* Opinion overlooked nothing material when it rejected the Commission's contention that the materials ordered to be delivered for this court's *in camera* inspection are protected from such production, inspection, or discovery by the attorney-client privilege. The only arguable point concerning the appropriateness of the court's order might have to do with its timing.

Under ARJD 21[25] it appears clear that a special prosecutor's investigative notes and materials would at least be discoverable after a determination of probable cause and the public filing of the formal statement of charges. *See* ARJD 15 and 16. However, given the method of investigation utilized by the Commission in the instant proceeding,[26] there is at least an arguable tension

---

[25]ARJD 21, entitled **"Discovery,"** provides:

 1. Within 10 days after service of the notice of formal hearing the commission must disclose to the respondent the following material and information within the possession or control of the commission, *its counsel or staff:*

 (a) The names and addresses of persons who have knowledge of facts relating to the complaint against the respondent;

 (b) Any written or recorded statements made by these persons and the substance of any oral statements claimed to have been made by the respondent;

 (c) Any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations; and

 (d) Any books, papers, documents, photographs or tangible objects pertaining to the case.

 2. The commission's obligation under this rule extends *to material and information in the possession or control of any persons who, on behalf of the commission, have participated in any investigation of the charges.*

(Emphasis added.)

[26]Judge Whitehead has challenged the jurisdiction of the Commission to engage in an extensive investigation to secure information from non-complaining, but perhaps otherwise knowledgeable, persons prior to a finding of probable cause. Despite the Commission's repeated characterization of the issue as frivolous, there are provisions within the Commission rules, as well as the Nevada Constitution that, at a minimum, invite serious analysis rather than superficial and emotive conclusions. For example, the Nevada Constitution states that: "The commission shall, *after preliminary investigation,* dismiss the matter or order a hearing to be held before it." Nev. Const. art. 6, § 21(7) (emphasis added). We have not yet interpreted the meaning of "preliminary." However, the dictionary definition of the term includes: "1. preceding and leading up to the main part, matter, or business; introductory; preparatory: *preliminary examinations.* 2. something preliminary, as an introductory or preparatory step, measure, contest, etc." The Random House Dictionary (2nd ed. 1987).

 Moreover, ARJD 15, in pertinent part, provides: "Based upon *the sworn*

between ARJD 14(5)[27] and ARJD 21. ARJD 14 arguably provides that if such materials have been generated prior to a probable cause hearing, and they have any relevance to the disciplinary action, they must be provided to the respondent judge. In any event, this issue will eventually be resolved as part of these proceedings when this court hereafter interprets the Commission rules to determine whether any of the materials produced for our *in camera* inspection are relevant and material to Judge Whitehead's claims in the instant petition relating to the breadth and scope of the investigation conducted by Special Deputy Attorney General/Special Counsel Campbell, or to Judge Whitehead's preparation to oppose a determination of probable cause.[28]

Nonetheless, the Commission argues that, under NRS 49.095,[29] "material which *memorializes communications between*

---

*complaint* and all relevant evidence referred to in *documents and memoranda* in the *respondent's* response and supporting documents and in the testimony of any witnesses *whom the respondent has presented,* the commission must make a finding whether or not probable cause exists." (Emphasis added.) Even the nature and source of a "sworn complaint" is an issue in this proceeding.

We do not, by highlighting or citing certain provisions of the Commission rules intend to imply any resolution or interpretation of these provisions and their meanings other than to note that there is a serious basis for discussing these issues in a professional, objective, and non-pejorative manner.

[27]ARJD 14, entitled **"Hearing to determine probable cause,"** provides in subsection (5):

5. In preparing to oppose a determination of probable cause, the respondent has *the right* to inspect *all* records of the commission *relating to the disciplinary action* against the respondent and to be *fully advised* as to the contents of the administrative record considered by the commission determining that there was sufficient reason for a probable cause hearing.

(Emphasis added.)

[28]Of course, in determining Judge Whitehead's entitlement to discovery of any of the *in camera* matter at issue, this court will also consider other factors and policies, including the extent to which the substance of any of the material may have been previously disclosed by or to the media. *See, e.g.,* United States v. Bernard, 877 F.2d 1463, 1465 (10th Cir. 1989) (voluntary disclosure of a confidential communication to a third party waives any privilege); Eigenheim Bank v. Halpern, 598 F. Supp. 988 (S.D.N.Y. 1984) (procedures for maintaining confidentiality were "so lax, careless, inadequate or indifferent to consequences" as to constitute waiver); Parkway Gallery v. Kittinger/Pennsylvania House Group, 116 F.R.D. 46, 50 (M.D.N.C. 1987) (in determining whether a document has lost its privilege, court may consider the reasonableness of precautions taken to prevent disclosure, the number and extent of the disclosures, any delay and measures taken to rectify disclosures, and any overriding interests of justice).

[29]NRS 49.095, entitled **"General Rule of Privilege,"** provides:

A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications:

*an attorney and client . . .* is privileged and confidential, and therefore not discoverable." *See* Respondent's Petition for Rehearing at 5 (emphasis added). We have also been advised by the Commission, however, that with one exception, insignificant to the proceedings before us,[30] "[t]he Commission has not reviewed special counsel's investigation, notes and files, and has not been informed as to their contents." *See* Respondent's Petition for Rehearing at 8. Thus, even from the Commission's own admission, it strongly appears that there is no basis for any claim that such material "memorializes *communications*" between Campbell and the Commission.

With respect to the Commission's contention that this court has failed to address its claim of privilege concerning the work-product doctrine, we emphasize that the purpose of the work-product doctrine is to protect against disclosure of mental impressions, conclusions, opinions and legal theories of counsel. NRCP 26(b)(3). The court has certainly not ordered an *in camera* inspection of documents to obtain Special Deputy Attorney General/Special Counsel Campbell's mental impressions and evaluations. We are, rather, seeking to determine the scope of his activities so that those activities might be evaluated in light of Judge Whitehead's claim that they exceed the limits placed upon preliminary investigations by the Nevada Constitution and the Commission Rules.

We further observe that in a study authored with the assistance of Jeffrey M. Shaman, who has been variously quoted by the Commission and the Las Vegas Review-Journal as an expert on judicial discipline, it is stated that in judicial discipline proceedings:

> States seem to divide into roughly three categories concerning the extent to which they protect work product. First, a few states indicate that there is no protection and the judge can receive nearly everything. For example, Kentucky's director says "work product protects little, if anything. All information gathered must be given to the judge under Rule 4.170(4) of our rules before formal charges are filed."

---

1. Between himself or his representative and his lawyer or his lawyer's representative.

2. Between his lawyer and the lawyer's representative.

3. Made for the purpose of facilitating the rendition of professional legal services to the client, by him or his lawyer to a lawyer representing another in a matter of common interest.

[30]The Commission represents that "Special counsel did however advise the Commission that the notes contain references to sitting and retired Supreme Court justices, and that a promise of confidentiality was given to each witness."

*See* Judith Rosenbaum (with the assistance of Jeffrey M. Shaman and Katherine Levin), American Judicature Society, *Practices and Procedures of State Judicial Conduct Organizations,* ch. 8 at 28 (1990).[31] The study also notes, in material part:

> Second, in several states the issue of work product protection has not come up at all. In Michigan, the reason derives from the specific requirements of Michigan's discovery rule. . . . [T]he rule specifies exactly what must be disclosed, *namely documentary evidence in the commission's possession, which is to be introduced at the hearing and the names and addresses of people to be called by the examiner.*

*Id.* (emphasis added).

Finally, the study notes that in most states certain types of "work product" are protected. *Id.* In Alaska, for example, "commission documents protected by work product include staff memoranda and notes and attorney evaluations and in Missouri the commission indicated that protected items include correspondence between commission members and counsel concerning analysis, research or procedure." *Id.* Such material is of an entirely different character than the reports of investigative interviews here at issue; however, disregarding that distinction, and assuming that, unlike the states with procedures similar to those of Kentucky and Michigan, Nevada's Commission rules can be read to permit assertion of a work-product privilege, this court must first review the materials *in camera* to decide what, if anything, can be subject to such a privilege under the applicable rules. Then, if we determine that a legitimate issue is presented, we can call for argument before making our final ruling.

Finally, to whatever extent, if any, the Commission rules might otherwise permit the Commission's invocation of either the attorney-client or work-product doctrines, it would not necessarily follow under the circumstances of this proceeding that any protection normally afforded under NRS 49.095 or NRCP 26(b)(3) would be held to be applicable here.[32] Because both the work-product and the attorney-client privileges:

---

[31]The study cites to Kentucky Supreme Court Rule 4.170(4) as providing, in material part:

> After the preliminary investigation is completed and before formal proceedings are initiated . . . the commission shall afford the judge under investigation an opportunity to examine all factual information, including the name of the complainant, and shall afford the judge an opportunity to furnish to the commission any information he may desire bearing on the investigation.

*Id.* at 28 n.102.

[32]NRCP 26(b)(3) provides in relevant part that "[i]n ordering discovery"

obstruct[] the search for truth and because [their] benefits are, at best, "indirect and speculative," [they] must be "strictly confined within the narrowest possible limits consistent with the logic of [their] principles."

*See* In re Grand Jury Proceedings, 604 F.2d 798, 802-03 (3rd Cir. 1979) (quoting In re Grand Jury Investigation, 599 F.2d 1224, 1235 (3rd Cir. 1979)). As noted, Judge Whitehead's claim is, in part, that the Commission has conducted an investigation in violation and far beyond the scope and breadth of the Commission rules and the Nevada Constitution. The normal protection may not be applicable to materials that shed direct light on a critical area of inquiry in the case. *See* In re Doe, 662 F.2d 1073, 1080 (4th Cir. 1981) (prima facie showing of illegal activity upon the part of the attorney was sufficient to overcome the work-product protection), *cert. denied,* 455 U.S. 1000 (1982); Diamond v. Stratton, 95 F.R.D. 503, 506 (S.D.N.Y. 1982) (substantial need for documents shown where they shed direct light on motive and knowledge of defendant and counsel, and actions of counsel were an issue in the case); Donovan v. Fitzsimmons, 90 F.R.D. 583, 588 (N.D. Ill. 1981) (to the extent that the advice of counsel is a critical area of inquiry in the case, the interests in attorney privacy must yield).

The foregoing considerations all lead us to conclude that neither the legal principles relating to the attorney-client privilege nor those relating to the work-product doctrine justify any correction or amendment of our *Whitehead I* Opinion.

7. *The fears of the Commission members that the facts set forth in* Whitehead I *portray the Commission as a "runaway tribunal" do not justify clarification of the Opinion*

The Petition/Motion recites:

[T]he Opinion . . . portrayed the Commission as a runaway tribunal unwilling to recognize any limitations on its power. Perpetuating this inaccuracy will result in public misunderstanding and unwarranted distrust of the Commission.

Petition/Motion at 9-10. Our Opinion did not in fact seek to portray the Commission in the manner claimed in the above-quoted statement. We simply recited the events we believed should be noted in order to understand our rulings. Still, it is quite true that the record now before us appears to document numerous areas in which both the Commission and the Commis-

---

of materials upon an appropriate showing, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

sion's counsel, on the Commission's behalf, seemingly have acted concerning Judge Whitehead and various other judges in numerous ways that do not conform to the ARJD. Whether that warrants the appellation "runaway tribunal" or not, we did not, and do not, presume to say.

In their answer to the Petition/Motion, Judge Whitehead's counsel have countered the Commission's contention that it is not a "runaway tribunal" with an affidavit recently tendered to them by the Honorable Thomas L. Stringfield, an experienced jurist and former District Attorney who is the senior presiding judge of Nevada's Fourth Judicial District. In that document, Judge Stringfield has provided a sworn account of his personal experiences with the Commission, and with the prosecutors supplied to the Commission by the Attorney General's office. To document his averments, Judge Stringfield has attached to his affidavit correspondence sent to him by the Commission as well as newsletters that the Commission has published in an apparent effort to enhance its public image. These submissions tender an unsettling picture of possible pervasive violations of the Nevada Constitution and the ARJD, perpetrated by Commission members and by prosecutors supplied by the Attorney General. Judge Stringfield's averments and submissions are especially disturbing because through documents emanating from the Commission itself it appears possible that not only Judge Stringfield but other members of the Nevada judiciary as well are secretly being subjected to gross abuses under the righteous banner of judicial discipline, following which the Commission's accomplishments are being publicized in its newsletters.

As examples of these abuses, we mention the Commission's evident refusal to supply copies of initial sworn complaints (assuming that they exist), unauthorized procedures such as secret "arbitration," secret "mediation" and secret "probation" and proceedings interminably extended and perpetuated in ways inconsistent with expectations of the ARJD. These all appear to be *ad hoc* innovations contemplated neither by the Nevada Constitution nor the current procedural rules promulgated by this court pursuant to the Constitution. We might also mention the lack of any discernable concern for the Commission's duty to protect the right of respondent judges to confidentiality and due process.[33] Therefore, while we retain regard for Commission

---

[33] ARJD 8 provides:

**Public statements by commission.**

In any case in which the subject matter becomes public, through independent sources, or upon a finding of probable cause and filing of a formal statement of charges, the commission may issue statements as it

members personally, we are not at this point prepared to say that the Commission is not, to use the Commission's counsel's expression, a "runaway tribunal unwilling to recognize any limitation on its power."

What we are prepared to say, however, is that this court is now and has been since the inception of this proceeding gravely concerned with the extent to which the public and the judicial branch of government will have respect and confidence in the Commission if that body is permitted to function outside the Commission rules. This court is also gravely concerned about the extent to which the judiciary may remain vital, independent, and impartial while under threat by a Commission allowed to operate under a form of secrecy and *ad hoc* disciplinary dispensa-

---

deems appropriate in order to confirm the pendency of the investigation, to clarify the procedural aspects of the disciplinary proceedings, to explain the right of the respondent to a fair hearing without prejudgment, and to state that the respondent denies the allegations. At all times, however, the commission, its counsel and staff must refrain from any public or private discussion about the merits of any pending or impending matter, or discussion which might otherwise prejudice a respondent's reputation or rights to due process.

Despite this rule, instead of trying to protect Judge Whitehead, the Commission's counsel have sought to resist any inquiry into inaccurate and degrading "leaks" to the media which are manifestly intended to coerce this court and deny Judge Whitehead due process of law either in this court or before the Commission. In fact, it is a matter of record that the Commission counsel have actually tried to capitalize on contrived "leaks" to the media (hopefully engineered by others) by basing efforts to disqualify justices upon inaccurate "leaked" material. They additionally have attempted to suggest that Judge Whitehead occasioned the obviously contrived leaks, even though the adverse impact on Judge Whitehead's interests has obviously been substantial. Also, the evidence on record thus far indicates that collectively the Commission's counsel have not only engaged in conduct that is not in accord with the ARJD, but, as mentioned, have made false statements of fact and law to this tribunal, SCR 172, and have unlawfully obstructed Judge Whitehead's access to evidence, SCR 173. Some of them have sought to influence this tribunal by false, abusive statements to the media and other means possibly prohibited by law, SCR 174, and some have made statements that a reasonable person should know would have "a substantial likelihood of materially prejudicing an adjudicative proceeding" in this court as well as possibly later before the Commission, SCR 177(1). It appears that Special Deputy Attorney General/Special Counsel Campbell may not personally have participated in all of the activities just mentioned, and for this we commend him; however, it does not appear of record that either Campbell or the Commission members have recognized any sense of duty to restrain other Commission counsel from inciting a circus-like atmosphere, and neither the Commission nor its counsel have undertaken any discernable action under ARJD 8 to protect Judge Whitehead's "reputation and rights to due process." *Id.; cf.* Garner v. State, 78 Nev. 366, 370, 374 P.2d 525, 528 (1962) (Court has duty to intervene *sua sponte* to correct serious and obvious violations of due process rights. "We are appalled by the consummate disregard of the defendant's right to a fair trial.").

tions that appear to be disconnected to the rules and powers of the Commission and the Nevada Constitution.

In the materials furnished to us by the Commission for *in camera* inspection are minutes for Commission meetings. These minutes do not fall within the claim of attorney-client or work-product privilege. They do, however, do much to reveal the *ad hoc* procedure which the Commission has adopted in a manner which appears contrary to the ARJD. One striking example is the case of Judge "D---,"[34] a case referred to in the Commission minutes that the Commission members and their counsel have provided to us for our inspection.[35] In the case of Judge "D---," as with Judge Stringfield, it appears that the Commission decided not to evaluate for substantive merit and procedural sufficiency any initial complaints against the jurist, as ARJD 14 contemplates; rather, the Commission, "based upon the evidence discovered through the Attorney General's investigation" decided to request the Attorney General "to prepare a complaint." As in the case of Judge Whitehead, it seems that the Attorney General's deputies conducted an investigation, reported their findings to the Commission, and thereupon secured approval to prepare their own formalized complaint without first holding a probable cause hearing. *Cf.* ARJD 16 (designation of a prosecutor, and preparation of formal charges, are to take place following hearing and determination of "probable cause"). On the basis of this "complaint," it appears from the minutes that the Commission and the Attorney General's prosecutors then entered into plea-bargaining

---

[34]We delete the coded number by which, for purposes of confidentiality, the Commission designed the subject judge in the Commission minutes. The numerical code is known only to the Commission.

[35]As noted in the text, the minutes provided to the court by the Commission do not fall under any of the claims of attorney-client or work-product privilege asserted by the Commission. The minutes provided to us by the Commission redirect our attention to matters already made known to the members of this court through information published by the Commission in the newsletter which is part of this record, and by way of a letter previously directed to all of the members of this court, the Attorney General, and the Commission by the complainant judge in the case described. Inasmuch as the minutes provided to the court by the Commission have merely corroborated and redirected our attention to incontrovertible facts, now verifiable from records in the building where we sit, we have concluded that our precedents do not require us to ignore them. *See* Cannon v. Taylor, 88 Nev. 89, 92, 493 P.2d 1212, 1213 (1972) (opinion on rehearing). In any event, the court may appropriately take judicial notice of facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *See, e.g.,* Ainsworth v. Combined Ins. Co., 105 Nev. 237, 267 n.20, 774 P.2d 1003, 1024 (1989); Jory v. Bennight, 91 Nev. 763, 542 P.2d 1400 (1975).

with Judge "D---" that ultimately resulted in the judge's capitulating and accepting forms of discipline uncontemplated either by the Nevada Constitution or the ARJD.

Among other things, the terms of discipline that the Commission imposed upon Judge "D---," after the extended, pre-probable cause, secret proceedings conducted by the Commission and the prosecutors, included the requirement that the judge undergo "psychological evaluations" and the requirement that the judge submit to "on-going counseling for anger-management" with the daughter of one of the Commissioners. (The minutes quite surprisingly reflect that "the Commission *found* no conflict" arising out of its order compelling Judge "D---" to counsel with the Commission member's daughter. The record does not reveal the sums of money that Judge "D---" expended for the professional services rendered either by the Commissioner's daughter or other professional counsellors which the judge was required to consult; we know only that the judge was specifically directed to continue anger-counseling with the daughter for a period of eight months.)

In addition, Judge "D---" was placed "on probation" under the supervision of the Attorney General's office, which was empowered to conduct on-going "follow-up examinations to include contact with witnesses at 6 and 12 month intervals." The judge's probation would be violated "[i]f a complaint is received by the Commission warranting a probable cause hearing." Under this *ad hoc* probationary scheme, the Attorney General's authority over Judge "D---" was declared "to be in effect for 18-24 months."[36] During this period, also, the Attorney General was authorized and directed to arrange for Judge "D---" to attend meetings with a retired Nevada judge, who has no official status with the Commission,[37] "in furtherance of the counseling measures taken above [with the Commission member's daughter]." Finally, going beyond the private imposition of these *ad hoc* conditions, the Commission also required Judge "D---" to agree to accept a public censure and issue a letter of apology. The Commission then recorded its achievements concerning Judge "D---" in a newsletter it began publishing in 1993, without any participation or approval from this court.

---

[36]During this period, presumably the Attorney General's deputies have continued to appear before Judge "D---," without ever advising their legal adversaries that they, or their office associates, are supervising the judge's "probation" and might, conceivably declare him a "parole violator" at any time.

[37]The judge selected for this purpose was the same person whom Judge Stringfield had been required to meet with for the purpose of "mediation"/ "arbitration"/"counseling" in regards to disputes with his court clerk over administrative matters.

As previously noted, the Commission has repeatedly emphasized that it has consistently been following procedures accepted by this court in Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992),[38] and did not anticipate that we would disapprove of the investigation of the charges against Judge Whitehead "especially given the Court's longstanding acquiescence in the investigative procedures that have been historically followed by the Commission." Respondent's Petition/Motion at 10.

This last representation is another example of the Commission's apparent willingness in this proceeding to place its imprimatur on statements that are unfounded and false. No member of this court as here constituted has acquiesced in the procedures as allegedly employed by the Commission in this case, as revealed in Judge Stringfield's affidavit and attachments, or as revealed in minutes concerning Judge "D---." Indeed, this is the first time that this court has had an opportunity to evaluate whether the Commission has been proceeding in accordance with the current rules.[39]

The Petition/Motion rather extravagantly advises this court that "the Commission has reviewed and investigated numerous complaints of judicial misconduct in the same manner as was followed with regard to Judge Whitehead since the April 1988 promulgation of the ARJD."[40] Judge Whitehead contends on the

---

[38]In a press release dated November 12, 1993, Attorney General Frankie Sue Del Papa stated, in part, that "[t]he procedure followed by the Commission is the same as that which is routinely followed in judicial discipline matters and has even been specifically approved by the Nevada Supreme Court in the *Goldman* case." In *Whitehead I,* we made it clear beyond the need for repetition that the Commission's rules of procedure then in effect were totally different from the permanent rules adopted by this court that became effective on April 29, 1988. We again emphasize, however, that the *Goldman* opinion itself states: "The Interim Rules *governed the commission proceedings involving appellant. They were superseded and replaced, however, on April 29, 1988, when the current and more comprehensive administrative and procedural rules became effective."* (Emphasis added.) The *Goldman* opinion established needed precedent relating to a district court judge's indiscriminate use of his contempt powers, and issues involving mixed questions of disability and misconduct. The opinion manifestly does not purport to interpret the current, operative Commission rules.

[39]We know of no case since *Goldman,* except this one, in which a special prosecutor has been utilized. As noted, even in *Goldman,* which was decided under the prior rules, no issue was tendered concerning investigative practices of the kind and scope here involved. Therefore, if the assertions of the Commission's counsel concerning *Goldman* are not intentionally deceptive, it appears that Commission's counsel may not understand how to evaluate the precedential significance of a judicial decision.

[40]In a press release issued by Attorney General Frankie Sue Del Papa

other hand that the Commission has been utilizing an *ad hoc* approach to matters brought before it. From Judge Stringfield's affidavit it appears that there has been a striking lack of consistency in Commission methodology.[41]

In the instant case, a special deputy attorney general/special prosecutor was employed *by the Attorney General* to interview and investigate numerous potential witnesses in order to prepare a complaint that would form the basis for a probable cause hearing. This apparently was not done in the Stringfield case nor in other disciplinary cases referred to in attachments to Judge Stringfield's affidavit. Nor, by the way, was it done in the *Goldman* case, where it appears that investigative efforts were directed to persons identified by initial complaints as opposed to those who could be enlisted by the prosecutor through an extensive interviewing process. Moreover, in stark contrast to the instant case, in *Goldman*, once a special prosecutor was appointed, the then Attorney General separated himself and his office from any further involvement in the proceedings.

We, of course, do not here decide whether the Commission has been operating in a manner so untethered to the Commission rules and the Nevada Constitution as to deprive it of jurisdiction. Certainly, the focus of this proceeding is not to decide whether the Commission should be characterized as a "runaway tribunal." Nonetheless, we must assure that the rules are clearly understood and uniformly applied as contemplated by the Nevada Constitution. In this respect, we fully concur with the statement of Attorney General Del Papa contained in a press release issued January 31, 1994: "What is at issue is whether there is one set of rules for some people and another set of rules for others."

It is therefore our intent, with all deliberate speed, to determine whether alleged violations of applicable rules in the case of Judge Jerry Carr Whitehead has caused the Commission to act without

---

dated November 12, 1993, the Attorney General stated, in part, that the procedure followed by the Commission in the instant proceeding "is the same as that which is routinely followed in judicial discipline matters and has even been specifically approved by the Nevada Supreme Court in the *Goldman* case." As appears from the record in this case, this statement is not true.

[41]It is understandable how Commission members, meeting together in an atmosphere of mutual respect, could permit their procedures to evolve (or degenerate, depending upon one's point of view) into a methodology of convenience and expediency, condoned by a concurring sense of justice. The end result, however, is no less frightening merely because we may view the Commission as being comprised of honorable, knowledgeable people. Discipline administered in varying degrees of darkness and variance from law, provides no basis for confidence in the system, and provides a means of *in terrorem* rule that can have only a deleterious effect on Nevada's judiciary.

or in excess of its jurisdiction. If so, we shall also decide what remedy should be applied. If not, we shall nonetheless have to decide how to treat the injuries suffered to Judge Whitehead's prospects for receiving due process of law that have occurred as a result of the unconstitutional breaches of confidentiality and the widespread hostility which has been improperly inculcated against him.

8. *The claim that two justices of this court should be disqualified that has been improperly tendered in the Petition/Motion for a serial, fourth time, does not warrant any clarification of our* Whitehead I *Opinion*

The Commission again presents argument calling for the disqualification from this proceeding of two justices of this court.[42] The Commission states that "the Court has refused to allow the motion [for disqualification] to be heard on its merits by a panel of unaffected justices in accordance with constitutional and statutory law, and has instead asserted that an alleged procedural

---

[42]NRAP 35(d) provides that "[s]erial motions or charges, whether entitled as separate challenges, or as supplements, or entitled in any other way, must not be filed, and will not be entertained." Despite this prohibition, the Commission has tendered for filing numerous separate documents arguing and rearguing the disqualification issue. The Commission first raised this point in its "Opposition to Motion to Disqualify Justice," filed November 24, 1993. It was next raised in the "Motion for Disqualification," lodged on January 20, 1994, and ultimately filed and denied by SENIOR JUSTICE ZENOFF, JUSTICE MIRIAM SHEARING and District Judge Addeliar D. Guy on January 31, 1994. The claim was made a third time in the "Respondent's Motion for Reconsideration of Order Denying Motion for Disqualification and Denying Motion to Strike Appointment of Senior Justice and Request for Hearing Pursuant to NRS 1.223(4)," which the court refused to file on February 18, 1994, on the ground that the motion was in violation of NRAP 35. Therefore, interjection of this claim as a fugitive contention in the present Petition/Motion is an improper serial assertion of this insubstantial argument to the court.

Given the fact that Commission filings on this subject have appeared to be an attempt to manipulate the voting on this court, it seems noteworthy to comment on the existing panel. District Court Judge Addeliar Guy was recommended to the Governor for appointment to this matter by CHIEF JUSTICE ROBERT ROSE, and CHIEF JUSTICE ROSE was strongly urged to remain in this proceeding by the Attorney General and the Commission. Moreover, SENIOR JUSTICE DAVID ZENOFF, whom Attorney General Frankie Sue Del Papa, in one of her press releases, erroneously described as JUSTICE STEFFEN's "long-time judicial colleague" (JUSTICE STEFFEN never served on the Nevada Supreme Court when JUSTICE ZENOFF was a member of the court), was the supreme court justice for whom CHIEF JUSTICE ROSE once clerked on this court. To suggest that SENIOR JUSTICE ZENOFF is somehow aligned with JUSTICE STEFFEN or that he has greater ties to JUSTICE STEFFEN than CHIEF JUSTICE ROSE is sheer fantasy. Finally, the Commission and the Attorney General have made no secret of their desire to have JUSTICE MIRIAM SHEARING on this panel.

deficiency precludes consideration of the Commission's motion." The Commission has misconstrued the nature of this court's orders denying the motion for disqualification.

This court did not simply refuse to consider the motion on the basis of an "alleged procedural deficiency." Rather, in an order filed on January 31, 1994, this court directed the Clerk of the Court to file the Commission's motion for disqualification and related documents. In a separate order entered on that same date, this court concluded *the motion was without merit,* that it stated *"no legally cognizable ground justifying disqualification,"* and that it was *"wholly insufficient, as a matter of law, to warrant a formal hearing under NRS 1.225(4)."* (Emphasis added.) *See, e.g.,* In re Petition to Recall Dunleavy, 104 Nev. 784, 769 P.2d 1271 (1988).

Moreover, in an order entered February 18, 1994, this court clarified the January 31, 1994, order and expressly concluded that the Commission's counsel had stated *no viable due process challenge to any justice's continued participation in this matter.* A review of the cases cited in this court's February 18, 1994, order provides ample support for these conclusions respecting the merits of the Commission's arguments. Nonetheless, because of the Commission's adamant refusal to accept this court's rulings respecting the issue of disqualification, we have elected to present patiently a pedantic recital of the procedural and substantive deficiencies apparent in the Commission's motions respecting disqualification.

NRAP 35(a) provides in part:

> In no event will the supreme court deem timely any motion or charge seeking disqualification . . . of a justice who has heard argument upon, or otherwise considered, any contested matter in the cause, except as to grounds based upon fraud or like illegal conduct of which the challenging party had no notice until after the contested matter was considered.

At the time the motion for disqualification was tendered for filing, the challenged justices had ruled on contested matters. Further, there was never any suggestion that the grounds for disqualification asserted by the Commission were based upon fraud or like illegal conduct. Therefore, the Commission's contentions were clearly untimely under NRAP 35(a).

NRAP 35(a) also provides:

> In cases or proceedings before the Supreme Court of Nevada, motions and charges seeking the disqualification or

recusal of a justice must not be based on any ground that the moving party has theretofore omitted to raise formally as soon as possible after receiving either actual or constructive notice thereof.

On October 18, 1993, in opposition to Judge Whitehead's motion to show cause and in an attribution that was in fact correct, counsel for the Commission attributed to the full court legal opinions expressed in hypothetical form in a letter written at the court's direction by the Clerk of this Court in response to an inquiry from the press. Thus, in October 1993, well before the motion for disqualification singling out VICE-CHIEF JUSTICE THOMAS STEFFEN and JUSTICE CHARLES SPRINGER was tendered, counsel for the Commission, concerned over this court's belief in the rightness of its rulings, could have asserted many of the same arguments against the full court that have now been selectively asserted against only the two challenged justices.

Next, in support of the motion for disqualification, the Commission attached to the motion what appears to be a facsimile copy of a letter written by attorney James E. Wilson. The apparent facsimile copy of the letter and the supporting affidavits of counsel quite clearly do not satisfy the procedural requirements of NRAP 35. For example, counsel's affidavits failed to set forth such facts as would be admissible in evidence. The supporting affidavits of counsel also did not contain averments in support of every fact alleged, made upon personal knowledge, by persons affirmatively shown competent to testify. As the court stated in United States v. Haldeman, 559 F.2d 31, 134 (D.C. Cir. 1976), *cert. denied sub nom*, Mitchell v. United States, 431 U.S. 933 (1977), in order to guard against groundless claims and the impositions they inflict upon the judicial process:

> courts have consistently held that the affidavit [of prejudice] must meet exacting standards. It must be strictly construed; it must be definite as to time, place, persons and circumstances. Assertions merely of a conclusory nature are not enough, nor are opinions or rumors. And the affidavit "must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment."

(Citations omitted.) In sum, counsel's supporting affidavits were wholly *insufficient to satisfy the procedural requirements of* NRAP 35.

The Commission has further contended, however, that the challenged justices have a personal and financial interest in the

outcome of this proceeding sufficient to warrant their disqualification under the due process clauses of the United States and the Nevada Constitutions. *See* Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813 (1986). Despite the procedural deficiencies noted above, this court also expressly concluded that the Commission stated no viable due process challenge to any justice's continued participation in this matter.

The due process clause of the Fourteenth Amendment to the United States Constitution prohibits a state from depriving *"any person* of life, liberty, or property, without due process of law." (Emphasis added.) The Nevada Constitution contains a similar provision providing that "[n]o *person* shall be . . . deprived of life, liberty, or property, without due process of law." Nev. Const. art. 1, § 8 (emphasis added).

The Fourteenth Amendment is a limitation on the states in the interest of individuals. *See* Cronson v. Clark, 810 F.2d 662, 665 (7th Cir. 1987), *cert. denied,* 484 U.S. 871 (1987); Com. of Pa. v. Porter, 659 F.2d 306 (3d Cir. 1981), *cert. denied,* 458 U.S. 1121 (1982). Similarly, the Nevada Constitution protects individuals against deprivations by the state of life, liberty, or property, without due process of law. The Commission is a public commission of the State of Nevada established pursuant to article 6, section 21 of the Nevada Constitution. The matters ultimately at issue in this proceeding concern whether the Commission, in the manner in which it has proceeded against Judge Whitehead, exceeded its jurisdiction and failed to adhere to Commission rules established by this court in accordance with the Nevada Constitution. No member of the Commission or counsel associated with the Commission has even attempted to assert a clear, protected life, liberty or property interest which will be implicated in this court's resolution of the issues presented. *See, e.g.,* Cronson v. Clark, 810 F.2d 662, 665 (7th Cir. 1987), *cert. denied,* 484 U.S. 871 (1987) (where a state auditor asserted a due process claim alleging that Illinois Supreme Court had improperly limited auditor's jurisdiction to conduct audit of state court, the federal court ruled that "it is certain that the due process clause does not confer on [the state auditor] a right to conduct a more extensive audit of the Supreme Court of Illinois, and therefore that he has suffered no injury on which this suit might proceed").

All parties to litigation in this court have a right to a fair and unbiased tribunal.[43] *See* Nev. Code of Judicial Conduct, Canon

---

[43]Consequently, although we entertain substantial doubts about the legal validity of the contentions under the circumstances of this proceeding, we

3E; NRS 1.225; NRAP 35. Not all questions of judicial qualification, however, rise to a constitutional level under the due process clause. *See Aetna Life Ins. Co.,* 475 U.S. at 820; In Re Murchison, 349 U.S. 133, 136 (1955); In re International Business Machines Corp., 618 F.2d 923, 932 n.11 (2d Cir. 1980). In the instant case, for example, the Commission has failed to establish the type of direct, personal, substantial, pecuniary interest which gives rise to a disqualifying interest under either the Nevada Code of Judicial Conduct, NRS 1.225, or the due process clause. No libel action on behalf of VICE-CHIEF JUSTICE STEFFEN and JUSTICE SPRINGER has been filed, and the justices have no financial stake in the outcome of this litigation. Accordingly, the allegations tendered by the Commission respecting the challenged justices' alleged direct, pecuniary interest are wholly insufficient, under NRS 1.225, the Nevada Code of Judicial Conduct, or the due process clauses of the United States or Nevada Constitutions to establish any direct, disqualifying, personal or pecuniary interest in the outcome of this litigation. *See also* Ainsworth v. Combined Ins. Co., 105 Nev. 237, 268-70, 774 P.2d 1003, 1025-26, *cert. denied,* 493 U.S. 958 (1989); In re Drexel Burnham Lambert Inc., 861 F.2d 1307 (2d Cir. 1988), *cert. denied sub nom,* Milken v. S.E.C., 490 U.S. 1102 (1989); United States v. Haldeman, 559 F.2d 31, 137 (D.C. Cir. 1976), *cert. denied sub nom,* Mitchell v. United States, 431 U.S. 933 (1977).

The Commission now acknowledges that the two justices have no disqualifying "financial interests" in the outcome of this proceeding; still, the Petition/Motion suggests that the justices ought to be disqualified by virtue of previous rulings that they have made in this case. Specifically, the Commission and the Commission's counsel contend that the "significant personal interest [of JUSTICES STEFFEN and SPRINGER] in vindicating prior actions and rulings in this case raises serious questions regarding their ability to be fair and impartial with regard to numerous issues still pending."[44] Petition/Motion at 12. Once again, no

---

need not address the Commission's contentions respecting its standing to assert a due process challenge under the federal doctrine of parens patriae. Moreover, inasmuch as the Commission has failed to establish that the impartiality of any justice of this court might reasonably be questioned under the Code of Judicial Conduct or other provisions of Nevada law, it would be anomalous to hold that the Commission's claim nonetheless satisfies the constitutional standard for recusal under the due process clause. *See* Ainsworth v. Combined Ins. Co., 105 Nev. 237, 258, 774 P.2d 1003, 1018 (1989), *cert. denied,* 493 U.S. 958 (1989) (citing In re International Business Machines Corp., 618 F.2d 923, 931-32 n.11 (2d Cir. 1980)).

[44]Those prior rulings have included CHIEF JUSTICE ROBERT E. ROSE and

authority is cited in support of this position, and understandably so. The United States Supreme Court has recently ruled that "judicial rulings alone *almost never* constitute a valid basis for a bias or partiality motion." Liteky v. United States, ...... U.S. ......, ......, 62 U.S.L.W. 4161, 4165 (1994) (emphasis added).

In his Concurring Opinion in Kelch v. Director, 107 Nev. 827, 834, 822 P.2d 1094, 1098 (1991), JUSTICE STEFFEN made the following point:

> This court routinely processes petitions for rehearing in which the court is invited to reconsider the propriety of its own rulings. I have yet to hear a justice contend that a conflict arises by virtue of the fact that we are faced with the prospect on rehearing of declaring ourselves in error in our initial dispositions.

As counsel for Judge Whitehead have noted, abhorrence of permitting a party to rely upon a court's prior ruling as grounds for recusal is reflected in the very provisions of the rules governing such challenges. Supreme Court Rule 48.1 provides: "A notice of peremptory challenge may not be filed against any judge who has made any ruling on a contested matter or commenced hearing any contested matter in the action." The purpose of such a rule is obviously to keep parties from "testing the waters" and then challenging a judge if his or her rulings are not in accord with the party's hopes.

The Commission has also contended that the challenged justices have manifested bias against the Commission by commenting on the merits of pending issues in this proceeding. The Commission contended that the challenged justices' disqualification was therefore warranted under NRS 1.225 and the Nevada Code of Judicial Conduct. The comments at issue which the Commission attributes to the challenged justices are contained in a letter dated January 10, 1994, written and signed by attorney James E. Wilson, and directed to Sherman Frederick, Publisher of the Las Vegas Review-Journal.

---

District Judge Addeliar Guy (who was recommended to the Governor for appointment by the Chief Justice), and JUSTICE MIRIAM SHEARING also approved the statement issued to the Las Vegas Review-Journal (published October 20, 1993) which explained the basis for this court's jurisdiction and the requirement of confidentiality, none of whom the Commission has challenged; nonetheless, the Commission persists in its contention that only JUSTICES STEFFEN and SPRINGER have an interest in maintaining the validity of their prior actions with respect to this proceeding. It is unclear why the Commission and its counsel have concluded that JUSTICES STEFFEN and SPRINGER alone have disfavored the Commission in the court's rulings or that they, more than their colleagues, would somehow shrink from admitting mistakes in prior decisions.

As noted above, these particular allegations were untimely pursuant to NRAP 35(a). Additionally, the comments in question evinced no fixed opinions relating to the matters ultimately at issue in this petition, *i.e.*, Judge Whitehead's claims that the Commission has proceeded unlawfully against him and in excess of its lawful jurisdiction. Rather, the comments of attorney Wilson set forth in his letter of January 10, 1994, related primarily to collateral procedural and jurisdictional contentions. Such contentions for the most part could have been considered pending and unresolved at the time only by virtue of the Commission's ill-prosecuted motion of October 12, 1993, which ostensibly sought reconsideration of prior rulings in this case. *See* Haines v. Ligget Group Inc., 975 F.2d 81 (3d Cir. 1992) (disqualification may be warranted where a judge expressed an opinion on the *ultimate* issue to be decided).

Further, the comments merely evinced Wilson's legal opinions, based upon the justices' prior participation in this case, that the prior rulings were issued in accordance with the state Constitution and Nevada law. To whatever extent the comments can be attributed to the challenged justices, we note that "[a] judge cannot be disqualified merely because he believes in upholding the law, even though he says so with vehemence." Baskin v. Brown, 174 F.2d 391, 394 (4th Cir. 1949); *see also* United States v. Haldeman, 559 F.2d at 136 n.332 (fixed opinions on the law are not disqualifying; comment is disqualifying only if it connotes a closed mind on the merits of the case) (citing United States v. Grinnel Corp., 384 U.S. 563, 583 (1966)).[45] The citizens of the State of Nevada have every right to expect that rulings issued by justices of this court are in full accord with what the justices honestly perceive to be the law. For members of the court to so justify or support their rulings does not constitute a disqualifying bias or appearance of impropriety.

Finally, the Commission contended that this court improperly refused to conduct a hearing on the motion for disqualification.

---

[45]The *Grinnel* and *Haldeman* cases also state the rule that a disqualifying bias must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from participation in the case. *Grinnel,* 384 U.S. at 583; *Haldeman,* 559 F.2d at 131-140. *See also* Goldman v. Bryan, 104 Nev. 644, 764 P.2d 1296 (1988); In re Petition to Recall Dunleavy, 104 Nev. 784, 769 P.2d 1271 (1988). *Compare* Liteky v. United States, ...... U.S. ......, 62 U.S.L.W. 4161 (1994) ("judicial rulings alone *almost never* constitute a valid basis for a bias or partiality motion").

*See* NRS 1.225(4) (hearing on a motion or charge for disqualification shall be had before the other justices of the supreme court). Not every motion for disqualification, however, rises to the level of a statutory "charge," which automatically calls for a formal hearing before unchallenged justices. For example, in the case of In re Petition to Recall Dunleavy, 104 Nev. 784, 789, 769 P.2d 1271, 1274 (1988), this court explained:

> [T]he statutory provisions and mechanisms providing for a judge's disqualification are not activated, and summary dismissal of the challenge is appropriate, where the challenge fails to allege legally cognizable grounds supporting a reasonable inference of bias or prejudice.

Similarly, in *Ainsworth,* 105 Nev. at 270-71, 774 P.2d at 1026, this court explained that because factual allegations raised in support of a motion to disqualify "present[ed] no legally competent grounds supporting a reasonable inference of bias . . . the hearing before unchallenged justices that is provided under NRS 1.225(4) [was] inapplicable." Therefore, in view of the legal insufficiency of the Commission's motion for disqualification, the Commission was not entitled to a hearing under NRS 1.225(4).

With regard to the Commission's counsel's practice of repetitively presenting the same assertion, Judge Whitehead's counsel refers to NRAP 35(d), which, as noted, provides:

> Serial motions or charges, whether entitled as separate challenges, or as supplements, or entitled in any other way, must not be filed, and will not be entertained.

Judge Whitehead's counsel contend that the Commission and Commission's counsel, having raised the same question of disqualification on four separate occasions, are in palpable violation of NRAP 35. Subsection (e) of the rule states:

> **(e) Sanctions for abuse or failure to comply with rule.** For any violation of this rule, or for the filing of any motion or charge or supporting documents found to be tendered for purposes of delay, lacking diligence or lacking good faith in any particular the court may impose appropriate sanctions, including awards of costs, attorney's fees, and damages to any person injured, delayed or inconvenienced by the motion or charge. If the supreme court determines that any abuse or misconduct has occurred warranting professional sanctions beyond monetary awards, the court may have a hearing for the purpose of determining the same or, in its discretion, may appoint a master to conduct a hearing in its stead and to make recommendations as to the sanctions being imposed.

This citation appears to be appropriate and worthy of further consideration.

## IV.
### CONCLUSION

The Petition/Motion is not cognizable; but to provide an historical record, the Clerk of the Court is hereby authorized and directed to file the Petition/Motion along with Judge Whitehead's answer to the Petition/Motion. The Petition/Motion is hereby denied. Pending further deliberations and consideration of the actions and incidents referred to in this Opinion and in our *Whitehead I* Opinion, as well as future actions of the parties and counsel, the court reserves judgment on all issues relating to Judge Whitehead's request for the imposition of sanctions.

It is so ORDERED.[46]

STEFFEN and SPRINGER, JJ., concur.

GUY, D. J., concurring:[1]

I concur with the results only. I would have simply denied the petition for rehearing as it became moot when the Commission complied with this Court's order.

SHEARING, J., concurring in part and dissenting in part:

I concur in the decision to grant the Commission's motion to file a document in excess of ten pages and to deny the Commission's motion to strike Judge Whitehead's answer.

I dissent in the decision to deny the Commission's Petition for Rehearing or in the Alternative for Amendment of Opinion. I believe now, as I believed when what the majority calls *Whitehead I* was signed, that this court should not issue opinions on such important matters in a piecemeal fashion without the benefit of full oral argument and due deliberation by all members of the court. Virtually every aspect of this case involves fundamental questions of the relationship between constitutional bodies of government. Yet the majority chooses to write multi-page opinions on motions or petitions for rehearing, motions which in

---

[46]THE HONORABLE THOMAS L. STEFFEN, Vice-Chief Justice, assigned THE HONORABLE DAVID ZENOFF, Senior Justice, to sit in the place of THE HONORABLE ROBERT E. ROSE, Chief Justice. Nev. Const., art. 6, § 19; SCR 10.

[1]The Governor appointed the Honorable Addeliar D. Guy, Judge of the Eighth Judicial District Court, to sit in place of THE HONORABLE CLIFF YOUNG, Justice, who is disqualified because he is a member of the Commission on Judicial Discipline. Nev. Const., art. 6, § 4.

other cases are invariably disposed of by one-sentence or one-paragraph orders, either granting or denying them. I would grant the petition for rehearing, withdraw the *Whitehead I* opinion and schedule oral argument to hear that issue as well as all matters, including Whitehead's underlying petition, on their merits. It is vital to the integrity of and public confidence in our courts that this entire matter be resolved expeditiously.

Aside from my objection to the piecemeal discussion of this case, I would grant the petition because the Commission has presented evidence of grave factual errors in *Whitehead I*. Even though the majority in this opinion attempts to justify some of the misstatements or unfair inferences in *Whitehead I,* it does not reflect well on this court that an opinion is published and allowed to remain in our permanent records when we are told of inaccuracies and refuse to change them.

The majority justifies its denial of the petition by saying that the outcome would not be changed and the Commission has already complied with the discovery order; therefore, the matter is of no material consequence and is moot. Clearly, the court has put the Commission in an untenable position. They were given the choice of either complying with the discovery order or facing individual contempt charges. Now, according to the majority, by complying with the court's order, the Commission forfeited the opportunity to correct the errors in the order. This is unfair. The petition should be granted.