*891 Springer, J.,
concurring:
I have signed the four-judge Majority Opinion in this case because I am convinced that the Attorney General must be removed from any participation in judicial discipline prosecution of Judge Jerry Carr Whitehead. I write this Concurring Opinion for two reasons: one is to answer some of the contentions raised by Justice Shearing in her Dissent, the other is that I wish to discuss the misconduct of Attorney General Del Papa, which I see as a ground for removing her from this case, in addition to, and entirely separate from, the grounds of constitutional incapacity and conflict of interest relied upon by the Majority Opinion.
Inasmuch as the Attorney General’s conflicts of interest and constitutional incapacity provide ample and sufficient grounds for the action taken by the Majority, I had initially agreed that it was unnecessary to voice my view that the Attorney General’s misconduct constitutes a discrete and independent ground warranting her removal from this matter. In light of the position now advanced by the Dissent, that constitutional incapacity and conflict of interest provide insufficient cause to support the Majority’s decision, I now feel compelled to address the additional cause found in the Attorney General’s disqualifying misconduct.

THE SHEARING DISSENT

Article 6, section 21(1) of the Nevada Constitution provides:
A justice of the supreme court or a district judge may, in addition to the provision of article 7 for impeachment, be censured, retired or removed by the commission on judicial discipline. A justice or judge may appeal from the action of the commission to the supreme court, which may reverse such action or take any alternative action provided in this subsection.
(Emphasis added.)
Despite this clear and unambiguous language contained in the “Judicial Article” of the Nevada Constitution, the Dissent insists: (1) that the Nevada Constitution does not vest the Commission “with the authority to exercise the judicial power of this state”; (2) that “the decisions of the Commission are not final”; and (3) that this court “alone has the power to enforce the Commission’s orders.”
From these three conclusions, it is apparent that my dissenting colleague perceives the Nevada Commission on Judicial Discipline as an impuissant tribunal possessed of mere advisory or recommendatory powers. Restrained by article 6, section 21(1) of the Nevada Constitution and persuasive, prior precedent of this court interpreting that provision, neither I, nor my colleagues in *892 the Majority, are willing or able to ascribe to the view that the Commission has been relegated to the impotent and ineffectual advisory status perceived by the Dissent. Therefore, for the reasons which follow, I emphatically and respectfully reject the views expressed in the Dissent.
First, the Dissent declares:
The decisions of the Commission are not final, but are subject to review by the Supreme Court, which alone has the judicial power to enforce the Commission’s orders.
This view of the Commission’s authority, however, is directly repelled by this court’s holding in Goldman v. Nevada Comm’n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992), a holding which the Attorney General, on behalf of the Commission, has repeatedly — albeit inaccurately and incompletely — cited to this court in the instant proceeding.
Specifically, in Goldman, this court explained at length:
The relevant constitutional provision defining this court’s jurisdictional role in an appeal challenging commission action specifies as follows:
A justice of the supreme court or a district judge may, in addition to the provision of article 7 for impeachment, be censured, retired or removed by the commission on judicial discipline. A justice or judge may appeal from the action of the commission to the supreme court, which may reverse such action or take any alternative action provided in this subsection.
Nev. Const, art. 6, § 21(1). Absent the prosecution of an appeal to this court by an aggrieved judge, this provision unambiguously vests the commission with final authority to order the censure, removal or retirement of a judicial officer. A commission decision to censure, remove or retire is not merely advisory or recommendatory in nature; it is of independent force and effect absent perfection of an appeal to this court. [‘]
This broad constitutional authority distinguishes Nevada’s commission from similar commissions in other jurisdictions. The California Commission on Judicial Performance, *893 for example, is constitutionally empowered only to make “recommendations” concerning the imposition of disciplinary sanctions. See Cal. Const, art. 6, § 18(c). Formal approval of further action by the California Supreme Court is necessary before any disciplinary sanctions may be imposed. Id.
*892 1 Of course, as the Majority Opinions in Whitehead 1 and II have emphasized, this section of the Goldman opinion only addressed the standards of review applicable to appeals from Commission decisions to censure, retire or remove. The quoted passage does not speak to this court’s authority to intervene in commission proceedings by way of extraordinary writ. See ARJD 40(7); Nev. Const, art. 6, § 4 (Nevada’s “all writs” provision).
*893 In declaring the standard of review to be applied under this “recommendation” system, the California Supreme Court has observed:
Were a recommendation of independent force and effect absent further action by this court, our review of the evidentiary basis for that recommendation might properly be limited to a determination whether the Commission’s findings of fact were supported by substantial evidence. Under such a standard of review we would not be free to disregard the Commission’s findings merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact.
Geiler, 515 P.2d at 4. In Geiler, however, the court further noted that the California Constitution expressly entrusts that state’s high court with the sole responsibility and authority to render “the ultimate, dispositive decision to censure or remove . ...” Id. In exercising that authority, the California court independently evaluates the record evidence and renders its own findings of fact and conclusions of law. Judicial disciplinary procedures in many other jurisdictions are patterned after California’s pioneering judicial disciplinary procedures and similarly require review and final approval of commission recommendations by a higher tribunal.

Thus, the express authority vested in this court under article 6, section 21 of the Nevada Constitution contrasts sharply with the ultimate and dispositive constitutional authority conferred upon courts of review in these “recommendation” jurisdictions. It is readily apparent that by deviating from the California model, the drafters of article 6, section 21 of the Nevada Constitution rejected California’s “recommendation” system in favor of procedures intended to vest afar greater degree of authority in Nevada’s commission. See, e.g., Matter of Samford, 352 So. 2d 1126, 1129 (Ala. 1978) (where adoption of constitutional amendment replaced old “recommendation” system of judicial discipline with new system merely authorizing appeal, Alabama court’s scope of review was restricted by such amendment to a determination of “whether the record shows clear and convincing evidence to support the order of the Court of the Judiciary”).

*894
We conclude, therefore, that the Nevada Constitution does not contemplate this court’s de novo or independent review of factual determinations of the commission on appeal. To the contrary, the constitution confines the scope of appellate review of the commission’s factual findings to a determination of whether the evidence in the record as a whole provides clear and convincing support for the commission’s findings. The commission’s factual findings may not be disregarded on appeal merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact. See Samford, 352 So. 2d at 1129; cf. Geiler, 515 P.2d at 4.

This court, of course, is not bound by the commission’s conclusions of law. Cf. In re Jones, 728 P.2d 311, 313 (Colo. 1986). Moreover, where an appeal from the commission’s order of censure, removal or retirement is taken, this court is expressly empowered to “reverse such action or take any alternative action provided in this subsection.” Nev. Const, art. 6, § 21(1). Thus, on appeal, we are specifically enjoined by the constitution to exercise our independent judgment regarding the appropriate sanction warranted by factual findings properly adduced by the commission.
See Goldman v. Nevada Comm’n on Judicial Discipline, 108 Nev. 251, 265-268, 830 P.2d 107, 116-118 (1992) (footnotes omitted; emphasis added).[2]
Thus, in interpreting article 6, section 21(1) of the Nevada Constitution, this court held in Goldman: (1) that the constitution “unambiguously” vests the Commission with “final authority to order the censure, removal or retirement of a judicial officer”-, and (2) that “a commission decision to censure, remove or retire is not merely advisory or recommendatory in nature; it is of independent force and effect absent perfection of an appeal to this court.” Id. (emphasis added).
Contrary to the Dissent’s assertion that the conclusions of the *895 Majority in Whitehead I are bereft of any supporting legal precedent, the Majority Opinion in Whitehead I did indeed cite this precise holding in Goldman as authority for the position that the Commission must be “regarded as being a constitutionally established ‘court of judicial performance and qualifications,’ whose functions are judicial in nature and essentially of the same fact-finding and law-applying nature that the state constitution assigns to the District Courts of this State.” See Whitehead I, 110 Nev. 123, 160 n.25, 869 P.2d 795, 815 n.25 (1994). Specifically, the Whitehead I Majority explained:
[The court in Goldman] assigned a higher status to the Commission and accorded greater deference to its final decisions than other courts have done, in accord with our view that the Commission is not to be regarded merely as an administrative agency but as a true “Court of Judicial Performance and Qualifications.'” Our deference to the Commission is in significant contrast to the California Supreme Court action in the case Geiler v. Comm’n on Judicial Qualifications, 515 P.2d 1 (Cal. 1973). Still, the fact that we held in Goldman that the Commission, like the District Courts, is free from our de novo or independent review of factual findings only emphasizes how important it is in Nevada’s system that the Commission, like our District Courts shall apply with fidelity the substantive legal principles articulated by other constituted authority. It also underscores that in Nevada it is highly important that the established substantive rules or principles be applied only in compliance with the procedural requirements delineated by constituted authority. Moreover, in Nevada, as with our District Courts, when counsel may have led the Commission to stray from its jurisdiction as defined in the rules by other constituted authority, it is important that such deviations be subject to review by interlocutory writ, as are those of the District Courts.

Id.

Notwithstanding this court’s meticulously crafted prior precedent interpreting the unambiguous language of article 6, section 21(1), the Dissent seems to be saying that the Judicial Discipline Commission is a mere “fact-finding” agency, akin to the Board of Medical Examiners or the Real Estate Commission. Citing to Bergman v. Kearney, 241 F. 884, 898 (D. Nev. 1917), the Dissent observes that “judicial power, in the constitutional sense, is something more than authority to hear and determine; it includes the power to decide finally and conclusively, and also power to carry its determination into effect.” Neither I, nor the *896 other justices in the Majority, quarrel with this definition in Kearney of “judicial power.” The Dissent, however, can cite to no constitutional provision, statute, or case authority which interprets article 6, section 21 of the Nevada Constitution so as to support the further conclusion in the Dissent that the Commission on Judicial Discipline should be viewed as merely an administrative “agency or commission” which is “not vested with the authority to exercise the judicial power of this state.” To the. contrary, the relevant constitutional provision and case law unambiguously establish that the Commission is indeed empowered “to decide finally and conclusively” matters related to judicial disability and misconduct, and “to carry its determinations into effect.”
For example, as the Majority Opinion in Whitehead I explained:
[The Commission] was created in 1976 by an amendment to the . . . “Judicial Department” article of our constitution that inserts into article 6 a new section 21, which not only creates the Commission but also grants this court certain powers over it. In very broad terms, section 21(1) recognizes that the Supreme Court, theretofore also created by the “Judicial Department” article, is to have appellate jurisdiction over the Commission, as it does over Nevada’s District Courts ....
Whitehead I, 110 Nev. at 131, 869 P.2d at 797. Significantly, the 1976 constitutional amendment establishing the Commission amended this state’s Judicial Article, the very Judicial Article cited by the Dissent as declaring where the judicial power of this state resides. Thus, while it is true that article 6, section 1 of the Nevada Constitution vests the judicial power of this state in a court system comprised of the supreme court, the district courts and the justice’s courts, the Dissent overlooks the fact that the 1976 amendment changed our Judicial Article so as to vest judicial power in the Commission as well.
As amended, the Nevada Constitution’s “Judicial Article,” now provides that a judge or justice may be “censured, retired or removed by the Commission.” Nev. Const, art. 6, § 21(1) (emphasis added). This adjudicative function includes, but is much more than, mere fact-finding. It simply cannot be seriously contended that the power “to censure, retire or remove,” vested in the Commission by an amendment to Nevada’s Judicial Article, does not now encompass the power to decide finally and conclusively questions related to censure, retirement and removal of a judge or justice, and to carry determinations respecting those *897 matters into effect.[3] Thus it is not merely that the Nevada Supreme Court has the constitutional power to fashion rules for the Commission that makes the Commission a true Court of the Judiciary within the judicial branch of government. The Nevada Constitution and the citizens of this state accomplished that task.
Furthermore, as this court has previously stated, the separation of powers requires the judiciary and not another branch of government to administer judicial affairs. See Dunphy v. Sheehan, 92 Nev. 259, 266, 549 P.2d 332, 336-37 (1976) (promulgation of Code of Judicial Ethics is essential to the due administration of justice and within the inherent power of the judicial department of this state). Thus, the creation of the Judicial Discipline Commission within the judicial branch of government is mandated by the separation of powers clause.
The Dissent observes that several state agencies exercise functions which may be described as quasi-judicial in nature. None of those agencies, however, have the kind of direct control over the judiciary itself which is vested in the Judicial Discipline Commission, a court constitutionally created as part of the judicial branch of government. This power to control the judiciary has been constitutionally placed within the judicial branch of government, specifically in the Commission, and it may not be directed by the executive branch without offending the doctrine of separation of powers.
The principle that a duty constitutionally entrusted to the judiciary cannot be exercised by one of the other branches of government is basic, black-letter law, appearing in standard legal reference works:
*898 Although executive or administrative officers or bodies may exercise powers of a judicial or quasi-judicial nature incidental to the exercise of their administrative functions, they may not exercise judicial authority, or interfere with the exercise thereof by the courts.
.... [I]t is a well established and universally recognized rule of constitutional law that executive or administrative officers, boards, or commissions may not, by reason of their executive or administrative powers, exercise judicial authority, or control or interfere with the courts in the exercise by the latter of judicial functions.
16 CJ.S. Constitutional Law § 219 (1984). While the quoted section of the Corpus Juris Secundum goes on to explain that “[executive officers] may investigate and determine facts as an incident to the performance of their administrative functions,” judicial discipline is not among the administrative functions of any executive office, but is the province of the Commission, constitutionally created as part of the judicial branch of government.
[T]he power of the judiciary, stemming from the doctrine of separation of powers, must prevail to control its own members. Any decision by the Attorney General’s office not to present [matters involving a judge’s misconduct] to a grand jury involves a discretionary determination by the executive branch and cannot bind or aifect the judicial branch in matters concerning the governance of the judiciary.
Matter of Yaccarino, 502 A.2d 3, 9 (N.J. 1985).[4]
The Dissent further declares: “The relationship of the Supreme Court to the Nevada Commission on Judicial Discipline is virtually the same as its relationship to the State Bar Disciplinary Boards and Hearing Panels except that the powers over the Bar are not expressly granted in the Constitution, but are deemed inherent powers.” The Dissent’s analogy is flawed.
The disciplinary boards and hearing panels of the state bar *899 conduct individual attorney disciplinary proceedings and tender findings and recommendations to this court respecting the imposition of public discipline including the sanctions of suspension and disbarment. If the 1976 amendments to the Nevada Constitution had created a Commission similar to the recommendatory judicial disciplinary systems presently in place in California and other states cited in the Dissenting Opinion, then the comparison with the state bar disciplinary function might have some force. Indeed, the recommendatory systems of judicial discipline in California and many other states have much in common with the procedures that govern attorney discipline in Nevada. For example, pursuant to SCR 105(3)(b), a decision of a hearing panel recommending suspension or disbarment is automatically appealed to the supreme court. Moreover, SCR 102(1) and (2) specifically provide that only the supreme court may order the disbarment or suspension of an attorney. Thus, like a judge facing discipline in a state with a recommendatory system of judicial discipline like California’s, an attorney facing discipline under Nevada’s attorney discipline system can only be suspended or disbarred from the practice of law by the state’s supreme court.
The inescapable fact remains, however, that the 1976 amendments to the Nevada Constitution did not create such a recom-mendatory system of judicial discipline in this state. Thus, the Dissent’s attempt to analogize attorney and judicial discipline procedures is not only insupportable, but somewhat unsettling inasmuch as it sets forth an analysis that appears oblivious to the fundamental structure of both Nevada’s attorney and judicial disciplinary procedures.
What the Dissent fails to appreciate is that Petitioner Whitehead is entitled to a judicial discipline proceeding free from the serious conflicts and constitutional improprieties created by the Attorney General’s association with the case precisely because the Nevada Commission on Judicial Discipline possesses the broad constitutional power to issue a final decision. Citing to the Commentary to Rule 4 of the 1993 proposed draft of the ABA Model Rules for Judicial Disciplinary Enforcement, the Dissent declares: “[Ajlthough the separation of investigatory and prose-cutorial functions is desirable, such separation is ‘not constitutionally mandated.’ ” The Dissent, however, overlooks the reason why such internal separation of judicial discipline functions of most state commissions is “not constitutionally mandated.” As the Report of the ABA Subcommittee recommending the proposed Model Rules also observes, systems of judicial discipline which combine all functions — investigation, prosecution, hearing and decision making — in a single process have “survived due process challenges because in this type of system the highest *900 court has the ultimate authority to review de novo and impose sanctions.” See Majority Report of Joint Subcommittee on Judicial Discipline on Model Rules for Judicial Disciplinary Enforcement at 3 (August 1994).
As noted above, and as the Attorney General herself has repeatedly emphasized in the instant case, this court decided in Goldman that “the Nevada Constitution does not contemplate this court’s de novo or independent review of factual determinations of the commission on appeal.” Thus, the analysis set forth in the Dissent fails to appreciate the substantial due process implications arising from the critical distinctions between a “rec-ommendatory” system of judicial discipline, and the system established under the Judicial Article of the Nevada Constitution. Under Nevada’s system, where the state’s highest court is foreclosed from conducting de novo or independent review of factual findings of the Commission, increased vigilance and careful scrutiny of the procedures employed by the Commission are essential to assure that an accused judge is accorded the fundamental fairness to which he or she is entitled under the Due Process Clause of the Constitution.
The Dissent’s analysis also apparently overlooks other crucial distinctions between the state bar’s disciplinary panels and the Judicial Discipline Commission. The state bar is emphatically not, as the Dissent points out, an “independent body created . . . by the people of the State of Nevada” as a part of the judicial branch of government; it does not draw its power from constitutional enabling provisions. Rather, the state bar is under the exclusive jurisdiction and control of the supreme court. Compare Nev. Const, art. 6, § 21 (constitutional referendum creating Judicial Discipline Commission) with NRS 1.215 (statute continuing state bar as a public corporation under the exclusive jurisdiction and control of the supreme court) and SCR 99 and 103 (Supreme Court Rule creating state bar disciplinary boards and hearing panels within the “exclusive disciplinary jurisdiction of the supreme court”).
More importantly, the disciplinary panels of the state bar do not possess the same final, independent authority over attorneys that the Commission possesses over judges. The state bar disciplinary panels have no authority to suspend or disbar attorneys; they merely recommend such discipline to this court, which retains the ultimate power to impose any appropriate sanction. By contrast, and as emphasized above, in the absence of an appeal by the aggrieved judge, the Nevada Judicial Discipline Commission has final, independent authority to censure, remove or retire a judge. Compare Goldman, 108 Nev. at 266, 830 P.2d at 117 (Commission decision to censure, remove or retire is not merely *901 advisory or recommendatory but is of independent force and eifect absent perfection of an appeal; constitution does not contemplate this court’s de novo or independent review of factual findings of Commission on appeal) with In re Kenick, 100 Nev. 273, 680 P.2d 972 (1984) (Supreme Court Rules cannot be construed to limit supreme court’s power to suspend or disbar; court is not bound by the findings and recommendations of the disciplinary board and must examine the record anew and exercise its independent judgment).
The Dissent relies on California and North Carolina precedent for the proposition that “case law indicates that several states have sanctioned the use of state Attorneys General for various functions in judicial discipline cases” (Dissent page 7). See Wenger v. Commission on Judicial Performance, 630 P.2d 954, 956 n.3 (Cal. 1981); Spruance v. Commission on Judicial Qualifications, 532 P.2d 1209, 1212-13 n.5 (Cal. 1975); In re Hardy, 240 S.E.2d 367 (N.C. 1978); In re Stuhl, 233 S.E.2d 562 (N.C. 1977). The Dissent’s reliance on the cited cases is misplaced because: (1) the separation of powers issue was simply not raised or addressed; (2) the attorneys general involved in these cases were not performing the kinds of multiple roles seen in this case; and (3) unlike Nevada, the systems of judicial discipline applicable in these jurisdictions are “recommendation” systems in which the state’s highest court has the ultimate authority to review commission decisions de novo and impose sanctions.
More specifically, the Dissent cites Wenger and Spruance as examples of instances where attorneys general acted in multiple capacities during judicial discipline proceedings, assuming the roles of examiners, investigators, prosecutors and counsel to the commissions on appeal or in proceedings attacking the legal correctness of the commissions’ actions. In Wenger and Spruance, however, it is clear that it is the California Supreme Court, and not the California Commission, which makes the final decision to censure, retire or remove the accused judge, although this power is contingent upon the recommendation of the Commission. In Nevada, by contrast, the Commission may itself order the censure, removal or retirement of a judge (ARJD 30(2)); the judge may then appeal this final decision to this court. Consequently, even though an attorney general may be utilized in California as the Dissent contends, the conflicts of interest created by an attorney general’s acting in multiple roles are far more significant in Nevada where, unlike California, the attorney general has been serving as an investigator, a prosecutor, and as counsel for the very tribunal empowered to issue a final decision respecting judicial misconduct. As the Spruance opinion notes, the California Commission appears before the California *902 Supreme Court, the final arbiter of all judicial discipline, in an adversarial role, and the examiners — which may be attorneys general — appear “merely as counsel to [the] respondent” Commission. Further, although the Wenger and Spruance opinions show that an examiner, who may be an attorney general, may act as a presenter of evidence before the Commission, and as counsel for the Commission before the California Supreme Court, the opinions do not provide specific support for the proposition that deputy attorneys general may act in these two roles at the same time.
A similar analysis applies to the two North Carolina cases cited in the Dissent. See In re Hardy, 240 S.E.2d 367 (N.C. 1978); In re Stuhl, 233 S.E.2d 562 (N.C. 1977). In Hardy, a deputy attorney general was utilized to present charges to a judicial discipline commission. In Stuhl, a deputy attorney general represented the judicial discipline commission in an adversary proceeding. However, a careful reading of these cases reveals that North Carolina follows the same scheme to which California adheres, namely, the judicial discipline commission in the cited cases merely recommends discipline, and the actual order to discipline is entered by the state supreme court. Thus, the cases are not applicable to the instant case for the same reasons discussed above.
The Dissent also protests that no actual conflicts of interest have been established or identified as a result of the Attorney General’s staff having acted as investigator, prosecutor, legal counsel to the Commission, and appellate advocate for the Commission in this matter. The Dissent perceives no evidence contradicting the averments of Special Deputy Attorney General Campbell and Assistant Attorney General Nielsen that Campbell was not in any way connected with or beholden to the Attorney General’s office. Much more than a mere “fanciful scenario,” however, supports the Majority’s conclusions. For example, a cursory review of the Commission’s minutes, Campbell’s billings, and the affidavits, statements, and exhibits discloses that Campbell was deputized as a member of the Attorney General’s staff, is contractually bound to serve “at the pleasure of the Attorney General” and is contractually bound to “report regularly to the Attorney General concerning the status of [this] case.” See Whitehead v. Comm’n on Jud. Discipline, 110 Nev. 380, 391-394, 873 P.2d 946, 953-955 (1994).
The Dissent also brands as “mere speculation” the Majority’s concern that the Attorney General’s office could present cases before the very judges her office is investigating or supervising.[5] *903 The case of Judge D ., however, outlined in the Majority Opinion in Whitehead II, presents precisely such a scenario. Judge D.was placed under the supervision of the Attorney General’s office which had the power to conduct on-going “follow-up examinations” including contacting witnesses. Id., 110 Nev. at 419, 873 P.2d at 970-971. This ad hoc probationary scheme obviously creates at a minimum the appearance of impropriety, if not an inference of actual bias.
The Pennsylvania Supreme Court was faced with a similar situation. See In Interest of McFall, 617 A.2d 707 (Pa. 1992). McFall involved appeals by some twenty-nine criminal defendants who charged that they had been denied their right to a fair and impartial tribunal because the judge who presided over their trials was assisting in an FBI investigation. Id. at 711. The FBI had previously caught the judge accepting a monetary gift from a potential litigant and had obtained the judge’s cooperation in its investigation by promising to tell any other investigating or prosecuting body of the judge’s full cooperation. Id. The Pennsylvania Supreme Court affirmed the intermediate appellate court’s order granting all twenty-nine criminal defendants a new trial because the defendants’ “rights to an impartial tribunal [had] been trampled upon” and because the court concluded “that the appearance of impropriety compels us to affirm the grant of new proceedings in view of the blatant potential conflict of interest of the trial judge.” Id. at 712. The court went on to note “[o]ne could reasonably conclude that, under the circumstances, [the judge]’s cooperation with the United States Attorney’s office cast her in the role of a confederate of the prosecutors in the appellees’ cases.” Id. at 713.
Although the Dissent perceives this type of potential conflict of interest to be a mere “specter,” it should be noted that there are two motions in criminal cases currently pending before this court in which the appellants seek to discover whether Judge D.or any other judge who is or has been subject to informal probation under the supervision of the Attorney General’s office presided over any portion of their criminal trials. Obviously if these appellants were prosecuted by the Attorney General’s office before judges like Judge D.who were simultaneously being “supervised” by the Attorney General’s office — this court would have to consider whether those appellants, like the appellants in *904 the McFall case, were denied a fair and impartial tribunal. The instant Majority Opinion seeks to avoid having this court placed in the unenviable position that the Pennsylvania Supreme Court found itself, i. e., having to order new proceedings in dozens of criminal cases because of the appearance that the judge who presided over those cases might be beholden to the prosecution.
Finally, the Dissent raises First Amendment concerns as a kind of all-purpose panacea against the Majority’s desire to appoint a special master to investigate the cause of leaks of confidential information in derogation of Petitioner’s constitutional rights. Although this expression of concern with the First Amendment might be an effective strategy for swaying public opinion, it has no legitimate legal basis.
Put quite simply, the First Amendment does not stand for the proposition that one who is under a duty not to reveal confidential information may breach this duty with impunity. See, e.g., Landmark Communication, Inc. v. Virginia, 435 U.S. 829, 837 n.9 (1978) (statute imposing criminal liability for breach of confidential judicial discipline proceedings might well be constitutional under the First Amendment if it is applicable only to direct participants in a judicial discipline inquiry); United States v. Richey, 924 F.2d 857 (9th Cir. 1991) (government may properly limit speech when compelling government interests out-weigh free expression interests of speaker); Kamasinski v. Judicial Review Council, 797 F. Supp. 1083 (D. Conn. 1992) (state’s interest in prohibiting disclosure prior to determination of probable cause is sufficiently compelling to survive the strictest First Amendment scrutiny).[6]
Moreover, a duty of confidentiality can be lawfully imposed and enforced where a breach of confidentiality is in derogation of the constitutional rights of the party meant to be protected thereby. As the United States Supreme Court stated in Sheppard v. Maxwell, 384 U.S. 333, 363 (1966):
The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permit *905 ted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures. [7]
(Emphasis added.)
If collaboration between counsel and the press is “subject to regulation . . . highly censurable and worthy of disciplinary measures” how much more would collaboration between a sitting judge and the press be worthy of such censure? Whitehead I ruled that the Judicial Discipline Commission constitutes a “Court of Judicial Performance and Qualifications” (despite the Dissent’s objection to this ruling, it is obvious, given the Commission’s authority to issue a final order censuring, removing or retiring a judge, that the Commission members are very real “judges” over petitioner). I need not belabor the obvious point that a judge, by virtue of his or her office, is prohibited from exercising certain First Amendment rights otherwise enjoyed by the general citizenry, namely, the right to comment on a pending case, even though that case may clearly implicate matters of great public concern. See Nevada Code of Judicial Conduct, Canon 3B, § 9. Judges are certainly not entitled to divulge confidential information learned in the course of their official duties; and they may be subject to disqualification, at the very least, for making public statements indicative of bias against a litigant.
In this regard, it must be remembered that the tone and effect of the news coverage of this matter has clearly been indicative of hostility towards Petitioner on the part of whomever made the leaks to the press. If such party is a member of the Judicial Discipline Commission who will sit in judgment over Petitioner, it cannot be expected that Petitioner will be given a fair hearing. Accordingly, the appointment of a master is necessary to protect Petitioner’s constitutional rights to an impartial tribunal.

ATTORNEY GENERAL DEL PAPA’S DISQUALIFYING MISCONDUCT IN THIS CASE

Even if the Dissent were correct in saying that there are no constitutional or conflict-of-interest bars to the Attorney Gen *906 eral’s continuing to act in the role of legal advisor and prosecutor in this case, I believe that there is another independent basis for disqualification of Attorney General Del Papa in the Whitehead case. Attorney General Del Papa should not be permitted to act as counsel in any capacity in this case, because she has displayed such animus, such a publicly-proclaimed antipathy toward the “defendant” judge in this case that she has rendered herself and her office unsuitable and incapacitated to serve as a prosecutorial advocate in the judicial discipline case involving Judge Whitehead. The Attorney General appears to have forgotten that her “primary duty is not to convict, but to see that justice is done” and that “cases must be tried in the courtroom rather than in the media.” Williams v. State, 103 Nev. 106, 110, 111, 734 P.2d 700, 703 (citations omitted). The Attorney General’s running public comments on this case display a continuous effort to influence public opinion against Judge Whitehead. Not only is this conduct ethically unacceptable, it is in direct violation of ARJD 8.[8] ARJD 8 is a very clear and explicit court rule which has been flouted by the Attorney General. This rule expressly commands that all counsel in judicial discipline matters, “at all times,” refrain from engaging in “any private or public discussion” which relates to the merits of any judicial discipline matter or which might “prejudice a [judge’s] reputation or rights to due process.” (Emphasis added.)
For most of the time that this case has been pending the Attorney General has been engaging in “public discussion[s]” of one kind or another about the case, saying over and over again that Judge Whitehead was charged with “serious misconduct” and issuing public statements that rather clearly violate ARJD 8. Rather than attempting to catalogue the various violations of ARJD 8,1 will rely in making my point on one very obvious and, may I say, flagrant example of the manner in which Attorney General Del Papa has defied this court rule. The Attorney General’s press release of January 31, 1994, epitomizes her refusal to abide by the rules. In this statewide press release, issued to all public news media sources, the Attorney General publicly accuses the judge of lying (“misrepresentation”), slander (“smearing others”) and tampering with the justice system (“going around and above the law”).[9] The Attorney General has *907 waged a public opinion war against Judge Whitehead and in public statements and press releases has repeatedly attempted to “try her case” in the media. The January 31 release is probably the worst and most undeniable example of the Attorney General’s misconduct.
Presumably the Attorney General is aware of the contents of ARJD 8 and aware that she is obliged to refrain from such “public . . . discussion[s]” and that she must not do or say anything that will “prejudice a [judge’s] reputation or rights to due process.” Can anyone doubt that publicly calling a judge a liar or slanderer or publicly accusing a judge of going “around and above the law” does not “prejudice” the judge’s reputation — especially when such statements go to every news source in the state and are made by none other than the Attorney General of the State of Nevada? Can anyone doubt that Judge Whitehead’s “due process rights” before the Commission have not been damaged by the Attorney General’s conduct? It may be that notwithstanding the history of this case there is some possibility that Judge Whitehead might somehow be afforded due process in the future, I do not know; but one thing is clear and that is that, given the damage that Attorney General Del Papa has done to Judge Whitehead’s reputation and the prejudicial effect that damage necessarily has had on Judge Whitehead’s due process rights, we cannot, entirely apart from any consideration of constitutional incapacity or conflict of interest, allow Attorney General Del Papa to continue to act in any capacity in this case. The Attorney General’s misconduct, by itself, and independent of the two grounds stated in the Majority Opinion, requires that she be removed from any contact with this case at once.
In Collier v. Legakes, 98 Nev. 307, 646 P.2d 1219 (1982), we recognized that the “disqualification of a prosecutor’s office rests with the sound discretion of the district court” and that “[i]n exercising that discretion, [the court] should consider all the facts and circumstances and determine whether the prosecutorial function could be carried out impartially . . . .” Id. at 309-10, 646 P.2d at 1220 (citations omitted). I cannot imagine how the Attorney General, who has also been acting as both Judge Whitehead’s prosecutor and the Judicial Commission’s legal counsel, can, given the pattern of her manner of handling this case and the inexcusable issuance of the press release of January 31, 1994, possibly be able to carry out the prosecutorial function “impartially” in this case. I do not see how it can be denied that the Attorney General is clearly unable to act “impartially” with *908 regard to a man whom she called “desperate” and whom she has publicly branded as a liar and slanderer who is trying to escape his just deserts by going “around and above the law.” In my opinion, her flagrant violation of court rules, her public comments on a pending judicial discipline case, and her prejudicial public statements against Judge Whitehead all combine to deny Judge Whitehead any possibility of receiving fair treatment and due process for so long as Attorney General Del Papa, her staff or her special prosecutor have anything to do with this case. I would disqualify her on this ground alone.
I am not ready at this time to pass judgment on what penalties should be meted out as a result of the Attorney General’s flouting of ARJD 8, but I am convinced that her actions relative to this case disqualify her from proceeding another day as the prosecutor or in any other capacity on this case.

 In a footnote in Goldman, this court further observed that the intent to vest far greater authority in Nevada’s Commission than is vested in states with “recommendation” systems is also evidenced by:
the care taken by the drafters to insure fairness, competence, non-partisanship and geographic diversity in the commission’s makeup. The commission, for example, must be composed of two justices or judges appointed by the supreme court, two attorneys appointed by the state bar, and three lay members appointed by the Governor. See Nev. Const, art. 6, § 21(2). Moreover, an appointing authority may not appoint more than one resident of any county, nor more than two members of the same political party. See Nev. Const, art. 6, § 21(4).
Goldman, 108 Nev. at 267 n.16, 830 P.2d at 117 n.16.

 With respect to the Commission’s power to carry its determinations into effect, the following passage from Goldman appears particularly relevant:
[T]he Nevada Constitution specifically empowers the commission to remove a judge from office for “willful misconduct, willful or persistent failure to perform the duties of his office or habitual intemperance . . . .” See Nev. Const, art. 6, § 21(6)(a). Further, the commission is authorized to retire a judge for advanced age or for a disabling mental or physical condition that is likely to be permanent in nature. See Nev. Const, art. 6, § 21(6)(b). The power to adjudicate and order the removal or retirement of a judge must necessarily imply the power to declare the office vacant. See generally, Galloway v. Truesdell, 83 Nev. 13, 422 P.2d 237 (1967). To the extent that the commission’s exercise of this implied authority may have conflicted with any express ministerial duty imposed upon the governor by the legislature, the commission’s power was clearly preeminent. See Goldman v. Bryan, 106 Nev. 30, 37, 787 P.2d 372, 377 (1990) (citing Robison v. District Court, 73 Nev. 169, 175, 313 P.2d 436, 440 (1957). To hold otherwise would elevate form over substance.
Goldman, 108 Nev. at 303, 830 P.2d at 141.

 The Dissent correctly observes, “not every exercise of a function judicial in nature constitutes an exercise of judicial power.” Nonetheless, it is evident that the Commission is empowered by the Constitution to exercise the inherent power of the judiciary to control the conduct of its own members. See, e.g., In re DeSaulnier, 279 N.E.2d 296 (Mass. 1971); see also Nev. Const, art. 4, § 1; Nev. Const, art. 5, § 1; Nev. Const, art. 6, § 21; Goldman v. Bryan, 104 Nev. 644, 654 n.7, 764 P.2d 1296, 1302 n.7 (1988); Goldberg v. District Court, 93 Nev. 614, 572 P.2d 521 (1977); Dunphy v. Sheehan, 92 Nev. 259, 549 P.2d 332 (1976); Lindauer v. Allen, 85 Nev. 430, 456 P.2d 851 (1969); State v. District Court, 85 Nev. 485, 457 P.2d 217 (1969); St. Ex Rel. Watson v. Merialdo, 70 Nev. 322, 268 P.2d 922 (1954).

 United States v. Hastings, 681 F.2d 706, 710-11 (1982), cert. denied, 459 U.S. 1203 (1983), cited in the Dissent, is inapposite. The judge in Hastings *903 sought judicial immunity from a federal criminal prosecution. The Majority Opinion obviously does not immunize judges from judicial discipline — it merely concludes that the Attorney General may not act as legal advisor or prosecutor in judicial discipline matters. Moreover, the Majority Opinion expressly states that the “Attorney General is constitutionally authorized to pursue criminal investigations and prosecutions of judges or justices.”

 See also Kamasinski v. Judicial Review Council, 843 F. Supp. 811 (D. Conn. 1994); Vassiliades v. Garfinckel’s, Brooks Bros., 492 A.2d 580 (D.C. Ct. App. 1985) (“[a] defendant is not released from an obligation of confidence merely because the information learned constitutes a matter of legitimate public interest.”); Cherne Indus., Inc. v. Grounds & Assoc., 278 N.W.2d 81, 94 (Minn. 1979) (“a former employee’s use of confidential information or trade secrets of his employer in violation of a contractual or fiduciary duty is not protected by the First Amendment).

 It should be noted that the decision of the United States Supreme Court in Gentile v. State Bar of Nevada, 501 U.S. 1030, 111 S. Ct. 2720 (1991), is not contrary authority to our decision on this issue. The Gentile decision involved attorney speech which was censured, not because it implicated the breach of a duty of confidentiality, but because it was substantially likely to prejudice materially an adjudicative proceeding. Moreover, a majority of the Supreme Court in Gentile specifically held that the proscription of speech there involved did satisfy the First Amendment. The rule was held unconstitutional as applied on vagueness grounds only.

 ARJD 8 provides, in pertinent part, that Commission counsel “must refrain from any public or private discussion about the merits of any pending or impending matter, or discussion which might otherwise prejudice a [judge’s] reputation or rights to due process.”

 The actual public charges made by Attorney General Del Papa against Judge Whitehead are that (1) the judge was guilty in this case of “gross misrepresentations of fact,” (2) that he was guilty of “smearing others in *907 order to try desperately to save himself,” (3) that the judge had gone “around and above the law,” and (4) that “even Judge Whitehead was not above the law.”